## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHIV PATEL, derivatively on behalf of PARETEUM CORPORATION, | |
| Plaintiff, | Case No.: |
| vs. | |
| ROBERT H. TURNER, EDWARD O'DONNELL, DENIS MCCARTHY, VICTOR BOZZO, LUIS JIMENEZ-TUÑON, ROBERT LIPPERT, LAURA THOMAS, and YVES VAN SANTE, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| PARETEUM CORPORATION, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Shiv Patel ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Pareteum Corporation ("Pareteum" or the "Company"), files this Verified Shareholder Derivative Complaint against Robert H. Turner, Edward O'Donnell, Denis McCarthy, Victor Bozzo, Luis Jimenez-Tuñon, Robert Lippert, Laura Thomas, and Yves van Sante (collectively, the "Individual Defendants," and together with Pareteum, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Pareteum, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and

Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Pareteum, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Pareteum's directors and officers from December 14, 2017 through the present (the "Relevant Period").

2.      Pareteum, previously known as Elephant Talk Communications, Corp., is a software communications platform company that provides global cloud communications services aimed at enhancing the mobile experiences of its customers. Pareteum purports to offer voice, video, text messaging, and data services to its customers, which include early stage businesses, software developers, and communications service providers.

3.      In late 2015, the Company undertook a restructuring effort to combat its declining business image, which included the rebranding of the Company as Pareteum, a 1-to-25 reverse stock split of the Company's common stock, and the appointment of Defendant Bozzo as CEO of the Company in November 2016. Following these developments, the Company's market cap expanded significantly, from less than $20 million during December 2016, to as much as $569 million during May 2019.

4.      During the Relevant Period, the Company built up a significant backlog of revenue, which consisted of revenue purportedly owed to the Company through its contracts to provide software and other services to its customers. For instance, for the fiscal year ended December 31, 2018, the Company's backlog totaled $615 million. The Company's backlog was an important means by which investors could gauge the expected profitability and growth prospects of the Company, and by reporting an extremely large backlog, the Individual Defendants caused the Company to signal that it would soon experience significant growth.

5.      However, many of the customers who purportedly contributed to the Company's backlog during this period were either greatly exaggerated or even nonexistent. Examples of these customers include European and African companies with little to no capital or meaningful business activity, businesses with inactive websites that offered limited contact information, and businesses that were outright closed or dissolved. As such, contrary to the Individual Defendants' statements touting the value of these contracts, it was unlikely that the Company would actually collect the revenue reflected in the Company's backlog from transactions with these customers.

6.      These facts were not disclosed in any of the Company's public statements or SEC filings issued during the Relevant Period. Rather, the Individual Defendants caused the Company to issue hundreds of press releases touting its artificially inflated backlog as evidence of positive revenue growth. Indeed, the market reacted favorably to the Individual Defendants' misleading representations as to the Company's business and prospects, as the price of the Company's stock, as well as the Company's market cap increased significantly during the Relevant Period. For instance, a January 11, 2019 Maxim Group analyst report commenting on the Company's prospects stated, "TEUM has over $500M in three-year contracted revenue backlog, which provides strong visibility for revenue growth."

7.      On March 18, 2019, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2018 with the SEC (the "2018 10-K"), which noted, for the first time, that there existed material weaknesses in the Company's internal controls over its financial reporting. As such, the Company's disclosure controls were ineffective as of December 31, 2018.

8.      Cracks began to appear in the Individual Defendants' false narrative beginning in June of 2019, when two critical research reports were published about the Company.

9.      On June 7, 2019, a research firm, Marcus Aurelius Value, published a disparaging report titled, "TEUM: Where Are The Customers?" (the "Marcus Aurelius Report"), pointing out the suspicious customer transactions that comprised the Company's abnormally large backlog. The Marcus Aurelius Report further documented numerous ties between certain of the Individual Defendants and various failed stock fraud schemes, as well as connections to entities associated with Barry Honig, a known stock manipulator and the subject of SEC and Department of Justice investigations. The Company never disclosed these ties during the Relevant Period.

10.     Subsequently, the price of the Company's stock fell to $2.58 per share at the close of trading on June 7, 2019, down from $3.41 per share at the close of trading on June 6, 2019, representing a loss in value of 24%. The Company adamantly denied the report, maintaining in a June 10, 2019 letter to shareholders that it was merely a "coordinated attack by short sellers."

11.     Soon after though, another report was published on June 25, 2019 by a different research firm, Viceroy Research Group, which detailed accounting discrepancies in the Company's financial statements stemming from the Company's inflated backlog.

12.     On this news, the price of the Company's stock dropped again, from $2.51 at the close of trading on June 25, 2019, to $2.00 at the close of trading on June 26, 2019, a 20% decline on heavy volume. Still, the Individual Defendants caused the Company to blatantly deny the

reports as "spurious claims" against Pareteum in a statement posted to the Company's website on June 27, 2019.

13.     On August 23, 2019, as the price of the Company's stock continued to dwindle, the Company was forced to amend a credit agreement with creditor Post Road Group in order to access funds it so desperately needed, due to the Company's failure to satisfy its obligations under the terms of the agreement. As a result, the Company was forced to issue a total of 1,000,000 shares of Company stock to Post Road Group, diluting existing Pareteum shareholders. This also caused the price of the Company's stock to fall from $2.76 per share at the close of trading on August 23, 2019, to $2.47 per share at the close of trading on August 26, 2019, representing a 10.5% decline in value.

14.     On September 20, 2019, in increasingly dire financial straits, the Company announced another highly dilutive offering of 18.8 million shares of the Company's common stock, and 3.8 million units of warrants to purchase shares of the Company's stock, priced at $40 million.

15.     On this news, the price of the Company's stock fell from $1.84 per share at the close of trading on September 19, 2019, to $1.67 per share at the close of trading on September 20, 2019, representing a 9.2% decline in value.

16.     The Company's misfortunes continued on October 15, 2019, when the Company issued a press release revealing that Defendant Denis McCarthy ("McCarthy"), who as Chief Operating Officer ("COO") was responsible for, among other things, maintaining the Company's backlog spreadsheets, had been terminated. Moreover, the Company disclosed that it had retained an executive search firm to "assess[] the board of directors and key leadership positions[.]"

17.     On this disclosure, the price of the Company's stock fell yet again over the course of several trading days, from $1.19 at the close of trading on October 14, 2019, to $0.83 per share at the close of trading on October 17, 2019, a decline of 30.2% on heavy volume.

18.     At last, on October 21, 2019, the Company issued a press release revealing that the Company's financial statements issued during the fiscal year ended December 31, 2018, and for the fiscal quarters ended March 31, 2019 and June 30, 2019 "should no longer be relied on," and consequently, would need to be restated, in part because the Company had "prematurely or inaccurately recognized revenue" flowing from certain customer transactions.

19.     On this news, the price of the Company's stock plunged from $0.74 per share at the close of trading on October 21, 2019, to $0.30 per share at the close of trading on October 22, 2019, representing a loss in value of nearly 60%.

20.     Throughout the Relevant Period, the investing public was under a false impression of the Company's business, operations, financial success, and growth.

21.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, finances, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company was unlikely to collect revenue from certain customer transactions; (2) the Company improperly recognized revenue in its financial statements from these customer transactions, in violation of Generally Accepted Accounting Principles ("GAAP"); (3) as a result, the Company's revenue backlog and accounts receivable were artificially inflated; and (4) the Company would ultimately need to restate each of its financial statements issued during

the fiscal year ended December 31, 2018, and for the fiscal quarters ended March 31, 2019 and June 30, 2019 . As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

22.     The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

23.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

24.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's former Chief Executive Officer ("CEO"), the Company's Chief Financial Officer ("CFO"), the Company's Chief Commercial Officer ("CCO"), and the Company's former COO to numerous federal securities fraud class action lawsuits, pending in the United States District Court for the Eastern District of New York and in the United States District Court for the Southern District of New York (the "Securities Class Actions"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

25.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

26.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's current directors, of the substantial likelihood of the current

directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Securities Act of 1933 and the Exchange Act.

28.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

29.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

30.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

31.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

32.     Plaintiff is a current shareholder of Pareteum. Plaintiff has continuously held Pareteum common stock at all relevant times. Plaintiff is a citizen of New Hampshire.

### Nominal Defendant Pareteum

33.     Pareteum is a Delaware corporation with its principal executive offices located at 1185 Avenue of the Americas, New York, New York 10036. Pareteum's shares trade on the NASDAQ Stock Exchange ("NASDAQ") under the ticker symbol "TEUM."

### Defendant Turner

34.     Defendant Robert H. Turner ("Turner") served as the Company's CEO from May 24, 2019, and as the Executive Chairman of the Board from November 16, 2015, until he was terminated from his positions with the Company on November 22, 2019. According to the Company's Schedule 14A filed with the SEC on June 6, 2019 (the "2019 Proxy Statement"), as of May 24, 2019, Defendant Turner beneficially owned 2,765,973 shares of the Company's common stock, which represented 2.5% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 24, 2019 was $4.72, Defendant Turner owned approximately $13,055,392 worth of Pareteum stock.

35.     For the fiscal year ended December 31, 2018, Defendant Turner received $5,281,843 in compensation from the Company. This included $321,225 in salary, a $600,000 bonus, $2,921,563 in bonus stock awards, and $1,439,055 in all other compensation.

36.     The Company's 2019 Proxy Statement stated the following about Defendant Turner:

> **Robert H. Turner** was appointed Executive Chairman of the Board of Directors on November 16, 2015 and Chief Executive Officer on May 24, 2019. Mr. Turner has 40 years' experience, cultivating and growing "all stage" global software,

telecom and tech companies. He emphasizes strategy, sales, organizational leadership, and fundamental financial results and leads with a culture that passionately serves the needs of valued constituents, while sustaining growth. Mr. Turner launched his career at AT&T, where he rose to serve at the highest ranks in a broad spectrum of international, start-up, and corporate firms, including (selected highlights): NeoNova Network Services, Inc.; Pac West; Telecom, Inc.; Panterra Networks; PTT Telecom Netherlands, US Inc. (now KPN); and BellSouth Communications, Inc. (now AT&T). Mr. Turner is also an advisory board member of The Capital Angels, affiliated with SC Angel Network. Mr. Turner earned a Bachelor of Science degree and a Master of Business Administration from the University of South Carolina, where he was presented with a Distinguished Alumni award in 2010. Mr. Turner is Guest Lecturer in the Darla Moore School of Business Professional MBA program.

37.     Upon information and belief, Defendant Turner is a resident of South Carolina.

**Defendant O'Donnell**

38.     Defendant Edward O'Donnell ("O'Donnell") has served as the Company's CFO since January 9, 2017. On November 1, 2019, Defendant O'Donnell was replaced as CFO by Defendant Thomas, who will serve as interim CFO. Defendant O'Donnell's status with the Company is currently under review. According to the 2019 Proxy Statement, as of May 24, 2019, Defendant O'Donnell beneficially owned 267,585 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 24, 2019 was $4.72, Defendant O'Donnell owned approximately $1,263,001 worth of Pareteum stock.

39.     For the fiscal year ended December 31, 2018, Defendant O'Donnell received $437,948 in compensation from the Company. This included $212,197 in salary, a $60,000 bonus, $151,397 in option awards, and $14,354 in all other compensation.

40.     The Company's 2019 Proxy Statement stated the following about Defendant O'Donnell:

**Edward O'Donnell** was appointed Chief Financial Officer on January 9, 2017. Mr. O'Donnell has over 23 years of experience in investment banking, advertising, private equity, investment, venture capital, technology, internet and other new media businesses. Prior to joining the Company, Mr. O'Donnell served as the Chief

Financial Officer of Ameri Holdings, Inc. (OTC: AMRH) from January 2016 through December 2016. Mr. O'Donnell has served as the Chief Operating Officer of Radbourne Property Group, Inc., an innovative operator of family entertainment centers, where his primary responsibilities included raising capital, external reporting, outlining capital structure and budgeting. From February 2013 until April 2015, Mr. O'Donnell served as chief financial officer of AudioEye, Inc. (OTC: AEYE). From December 2010 until January 2013, Mr. O'Donnell served as Vice President of Finance for Augme Technologies, Inc. (Previously OTC: AUGT), which provides strategic services and mobile marketing technology to leading consumer and healthcare brands. From January 2007 until November 2010, Mr. O'Donnell served as Chief Financial Officer of Carlyle Capital Group LLC, a venture capital and private equity firm. Previously, Mr. O'Donnell also served as Senior Vice President of Finance & Investor Relations of ACTV, Inc. (previously NASDAQ: IATV), where he developed the investor relations department before the company was purchased by OpenTV, a subsidiary of Liberty Media. Mr. O'Donnell is a Certified Public Accountant in New York and a member of NYSSCPAs and AICPA. Mr. O'Donnell earned a B.S. degree in Accountancy from Villanova University in 1991 and an M.B.A. from Columbia Business School in 2003. We believe that Mr. O'Donnell's extensive education and background in accounting and finance makes him qualified to serve as our Chief Financial Officer.

41.     Upon information and belief, Defendant O'Donnell is a resident of New York.

**Defendant McCarthy**

42.     Defendant McCarthy served as the Company's COO from May 24, 2019, until he was terminated on October 9, 2019. Previously, he served as President of the Company from October 1, 2018 until May 24, 2019. According to the 2019 Proxy Statement, as of May 24, 2019, Defendant McCarthy beneficially owned 81,250 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 24, 2019 was $4.72, Defendant McCarthy owned approximately $383,500 worth of Pareteum stock.

43.     For the fiscal year ended December 31, 2018, Defendant McCarthy received $354,192 in compensation from the Company. This included $198,509 in salary, $138,021 in option awards, and $17,662 in all other compensation.

44.     The Company's 2019 Proxy Statement stated the following about Defendant McCarthy:

**Denis McCarthy** was appointed Chief Operating Officer of the Company on May 24, 2019. Mr. McCarthy was President of the Company from October 1, 2018 until May 2019, and originally joined the Company on January 1, 2018 as SVP of Corporate Development. From 2014 through 2017, Mr. McCarthy was Senior Vice President of Operations and Finance at Mosaic Networx Inc., which delivers cloud-based data and telephony services to enterprises, where he handled all aspects of finance, systems integration, human resources and strategic relationships including merger and acquisition activity. From 2011 through 2013, Mr. McCarthy was Senior Vice President of Finance with United Brands Product Design. Prior to that, Mr. McCarthy was CFO of AP Telecom, a global sales channel manager for Undersea Cable Installations. He was CFO and COO of Pac-West Telecomm, a provider of next generation VoIP solutions for enterprise and communications services providers, which includes Telastic, a division of PacWest that developed cutting edge cloud-based telephony, billing and support systems. Mr. McCarthy began his career and spent nearly ten years in public accounting, providing assurance and advisory services in the high technology and software industry, including telecommunications and bio-tech companies both at Arthur Andersen and RSM. He holds a Bachelor of Science in Business Administration and a Master of Science in Administration from Bryant University.

45.     Upon information and belief, Defendant McCarthy is a resident of California.

**Defendant Bozzo**

46.     Defendant Victor Bozzo ("Bozzo") has served as the Company's CCO since May 24, 2019. Previously, he served as CEO of the Company from November 1, 2016 until May 24, 2019. According to the 2019 Proxy Statement, as of May 24, 2019, Defendant Bozzo beneficially owned 874,590 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 24, 2019 was $4.72, Defendant Bozzo owned approximately $4,128,064 worth of Pareteum stock.

47.     For the fiscal year ended December 31, 2018, Defendant Bozzo received $2,161,536 in compensation from the Company. This included $293,162 in salary, a $325,000 bonus, $687,788 in bonus stock awards, $460,064 in option awards, and $395,521 in all other compensation.

48.     The Company's 2019 Proxy Statement stated the following about Defendant Bozzo:

> **Victor Bozzo** was appointed Chief Commercial Officer on May 24, 2019. Mr. Bozzo was Chief Executive Officer of the Company from November 1, 2016 until May 2019. Mr. Bozzo served as Senior Vice President, Worldwide Sales and Marketing for Telarix Inc., a market leader in interconnect solutions for service providers. Under Mr. Bozzo's sales and marketing leadership, sales increased significantly, and the company received numerous market leadership accolades, ultimately leading to a highly successful exit for investors. Prior to joining Telarix, Mr. Bozzo served as President and General Manager of Pac-West's Emerging Technologies division after selling Pac-West his startup, Factor Communications, an innovative portfolio of cloud-based communications services. He was also responsible for significant revenue and customer growth and investor returns at exTone Communications, ITXC Corporation, and Voxware.

49.     Upon information and belief, Defendant Bozzo is a resident of New York.

**Defendant Jimenez-Tuñon**

50.     Defendant Luis Jimenez-Tuñon ("Jimenez-Tuñon") has served as a Company director since March 1, 2017. He also serves as the Chair of the Company's Compensation Committee, and as a member of the Audit and Finance Committee and the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of May 24, 2019, Defendant Jimenez-Tuñon beneficially owned 291,166 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 24, 2019 was $4.72, Defendant Jimenez-Tuñon owned approximately $1,374,303 worth of Pareteum stock.

51.     For the fiscal year ended December 31, 2018, Defendant Jimenez-Tuñon received $380,009 in compensation from the Company. This included $40,000 in fees earned or paid in cash, $437,758 in stock awards[1], and $97,749 in non-qualified deferred compensation earnings.

---

[1] The Company's 2019 Proxy Statement stated the following with respect to stock awards granted by the Company to its directors: "[t]he amounts included in these columns are the aggregate fair values of the awards granted by the Company to the directors in the fiscal year in lieu of cash fees or other awards, valued in accordance with FASB ASC

52.     The Company's 2019 Proxy Statement stated the following about Defendant Jimenez-Tuñon:

> **Luis Jimenez-Tuñon** was appointed a director on March 1, 2017. Mr. Jimenez-Tuñon is a distinguished mobile telecommunications industry leader, having served as CEO of the Company's largest customer, Vodafone Enabler Spain S.L. ("Vodafone Enabler") from July 2011 to December 2016. In addition to his role at Vodafone Enabler, during a decade at Vodafone, Mr. Jimenez-Tuñon has also held leadership positions at Vodafone Spain where he was responsible for business development and strategy of the group's Mobile Virtual Network Operators (MVNOs), enablers, roaming services, international carriers and wholesale fixed broadband business lines. Mr. Jimenez-Tuñon is currently founder and CEO of Red Queen Ventures, S.L. (www.redqueen-ventures.com) a global high-tech advisory and Investment Company focused on technology, telecom, MVNO/E, satellite and aerospace. As Chief executive of Vodafone Enabler, he pioneered the Company's innovative business model and powered the launch of Vodafone Spain's second brand Lowi.es which was awarded best Spanish MVNO in 2015 and 2016. Started in 2011, under his leadership, Vodafone Enabler boosted its revenue, profit and operational performance, and achieved internationalization. Previously, Luis held several executive positions at Vodafone Spain, including Senior Vice President where he grew business to hundreds of millions of euros in yearly revenue. Mr. Jimenez began his career in the satellite industry in 2002 holding various positions including Research engineer at the National Space Institute of Denmark and later Deputy Commercial Director of INSA (today ISDEFE), Spain's leading satellite operations company managing NASA and ESA tracking stations. Luis has received several professional and academic awards at international and national levels. Luis earned an Executive MBA from EOI Business School, a Master's Degree in Satellite Communications from Polytechnic University of Madrid, and an MSc in Telecommunications Engineering from the University of Zaragoza in cooperation with the Technical University of Denmark. He also completed the Executive Management Program (SEP) from the Graduate School of business at Stanford University in California, of which he is lifetime alumni. Along with his executive career, Luis has been guest speaker at international business summits and has published several papers.

53.     Upon information and belief, Defendant Jimenez-Tuñon is a resident of Spain.

---

Topic 718 for the fiscal year ended December 31, 2018. Pursuant to SEC rules, the amounts in these columns exclude the impact of estimated forfeitures related to service-based vesting conditions. The share prices used for the 2018 calculations in this table are the share prices of the last 10 trading days of the quarter covering the compensation related period. Compensation to the directors can be elected by the directors, at the beginning of the quarter, either in cash or in shares. When directors opt for payment in shares there is a 25% discount on the 'purchase' price. The amounts however are shown at fair market value at the date of delivery. In principle non-executive officer directors might earn up to approximately 33% more than the standard director fees if they have elected to receive 100% compensation in shares."

**Defendant Lippert**

54.     Defendant Robert Lippert ("Lippert") has served as a Company director since November 16, 2018. He also serves as the Chair of the Company's Audit and Finance Committee, and as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of May 24, 2019, Defendant Lippert beneficially owned 16,967 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 24, 2019 was $4.72, Defendant Lippert owned approximately $80,084 worth of Pareteum stock.

55.     For the fiscal year ended December 31, 2018, Defendant Lippert received $19,899 in compensation from the Company, which consisted entirely of non-qualified deferred compensation earnings.

56.     The Company's 2019 Proxy Statement stated the following about Defendant Lippert:

> **Robert Lippert** was appointed a director on November 16, 2018. Dr. Lippert is a financial economist who has held corporate, consulting and academic positions in the areas of finance and strategy. He has more than two decades of business experience around the world. Dr. Lippert is also the coauthor of The New CFOs: How Finance Teams and Their Leaders Can Revolutionize Modern Business coauthored with Liz Mellon, David C. Nagel and Nigel Slack. He has been on the faculty of Emory University, Georgia State University, Rutgers University and the University of South Carolina. He has won numerous teaching awards, published extensively, taught and consulted in 50 plus countries and been Key Note Speaker at numerous events across five continents. He currently designs and delivers a variety of Executive Education courses for DukeCE, Emory, UCLA, UNC-Chapel Hill, and University of Pennsylvania Wharton School of Business. Among others, clients have included: AbbVie, Alcatel, Bank of America/Merrill Lynch, BCBS, CenturyLink, ComcastNBCU, CVS, Enterprise Ireland, Farmers Insurance, HP, Home Depot, IBM, KPMG, Owens Corning, PWC, Samsung, U.S. Navy, UPS and Verizon. In addition to being a faculty member, his work in executive development, consulting, and executive coaching, Dr. Lippert was interim CFO and Vice President of Strategic Planning for the Seibels Bruce Group, a publicly traded holding company, which specialized in insurance-related activities. His primary duties in these capacities were to manage the acquisition, integration and divestiture

of existing businesses; oversee the formulation and implementation of the corporate strategic plan; manage the business planning and budgeting process; co-manage a multi-million-dollar investment portfolio; and interact with Wall Street analysts, investment bankers and investors in the financial community. Dr. Lippert earned his Ph.D. in Finance from the University of South Carolina and a BSBA from Xavier University.

57.     Upon information and belief, Defendant Lippert is a resident of South Carolina.

**Defendant Thomas**

58.     Defendant Laura Thomas ("Thomas") served as a Company director from July 25, 2017, until she resigned on November 28, 2018. On November 1, 2019, Defendant Thomas was appointed as the Company's interim CFO.

59.     For the fiscal year ended December 31, 2018, Defendant Thomas received $211,948 in compensation from the Company. This included $181,054 in fees earned or paid in cash, $47,002 in stock awards, $31,941 in option awards, and $48,048 in non-qualified deferred compensation earnings.

60.     The Company's Schedule 14A filed with the SEC on August 3, 2018 (the "2018 Proxy Statement") stated the following about Defendant Thomas:

**Laura Thomas** was appointed a director on July 25, 2017. Ms. Thomas previously served as the Chief Financial Officer of Towerstream, Inc., from May 2017 through January 2018. And on the Board of Directors of Impact Telecom ("Impact"), a full-service telecommunications company, from January 2016 through December 2016, during which time she served as Chairman of the Board of Directors from January 2016 through June 2016. From December 2014 through December 2015 she served as the Chief Executive Officer of TNCI Operating Company, which acquired Impact in January 2016. From 2000 through 2014 she served in a variety of roles at XO Holdings, Inc. (now XO Communications), a telecommunications services provider, including as Chief Financial Officer from May 2009 through April 2011 and again from December 2013 through August 2014, and as Chief Executive Officer from April 2011 through December 2013.

61.     Upon information and belief, Defendant Thomas is a resident of California.

**Defendant van Sante**

62.     Defendant Yves van Sante ("van Sante") has served as a Company director since June 1, 2014. He also serves as the Chair of the Company's Nominating and Corporate Governance Committee, and as a member of the Audit and Finance Committee and the Compensation Committee. According to the 2019 Proxy Statement, as of May 24, 2019, Defendant van Sante beneficially owned 286,285 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 24, 2019 was $4.72, Defendant van Sante owned approximately $1,351,265 worth of Pareteum stock.

63.     For the fiscal year ended December 31, 2018, Defendant van Sante received $324,949 in compensation from the Company. This included $129,851 in fees earned or paid in cash, $237,865 in stock awards, and $42,767 in non-qualified deferred compensation earnings.

64.     The Company's 2019 Proxy Statement stated the following about Defendant van Sante:

> **Yves van Sante** was appointed a director on June 1, 2014. From July 2011 to May 2014, Mr. van Sante was a board observer for our Company, following his service on our Board of Directors from October 2006 to July 2011. Mr. van Sante (1960) studied Marketing, Communication and Commercial Management. He started his career in 1982 as an advisor at United Brokers and became sales manager for Brinkers International, the market leader in refining oil for the food industry, a year later. From 1987 until 1993 he served as Sales and Marketing manager Central Europe at 3C Communications in Luxemburg, where he launched Credit Card Telephony across Europe. Following this position, he became a business unit manager Public Telephony at Belgacom, the Belgium incumbent, where he managed a department of 650 employees and a € 40 million business. In 1994, together with Steven van der Velden, Yves van Sante co-founded InTouch Telecom. As its managing director he was responsible for business development, sales and marketing. In 1999, when achieving a turnover of € 25 million and having grown to 125 staff, InTouch was sold to GTS, a pan European Telecom operator. Mr. van Sante became vice-president Business Services with GTS in London, where he consolidated acquisitions and turned the voice Telco around into an IP operator. In 2000 he became Managing Director of Eport, a call centre owned by the Port of Ostend. After six months Eport was sold to the Dutch call-centre Call-IT, and Mr. van Sante became advisor to its Management Board. In 2002 he founded Q.A.T. Investments. Concurrently, he has held various Management and

Board functions in companies in the QAT portfolio. Mr. van Sante is a member of De Warande and member of the Board of Directors of Festival of Flanders.

65.     Upon information and belief, Defendant van Sante is a resident of Belgium.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

66.     By reason of their positions as officers and/or directors of Pareteum, and because of their ability to control the business and corporate affairs of Pareteum, the Individual Defendants owed Pareteum and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Pareteum in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Pareteum and its shareholders so as to benefit all shareholders equally.

67.     Each director and officer of the Company owes to Pareteum and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

68.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Pareteum, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

69.     To discharge their duties, the controlling shareholder, officers and directors of Pareteum were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

70.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The

conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Pareteum, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

71.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

72.     To discharge their duties, the officers and directors of Pareteum were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Pareteum were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to Pareteum's own Code of Business Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Pareteum conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Pareteum and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Pareteum's operations would comply with all applicable laws and Pareteum's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

73.     Each of the Individual Defendants further owed to Pareteum and the shareholders the duty of loyalty requiring that each favor Pareteum's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

74.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Pareteum and were at all times acting within the course and scope of such agency.

75.     Because of their advisory, executive, managerial, and directorial positions with Pareteum, each of the Individual Defendants had access to adverse, non-public information about the Company.

76.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Pareteum.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

77.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

78.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Exchange Act;

(ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

79.    The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Pareteum was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

80.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

81.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of Pareteum, and was at all times acting within the course and scope of such agency.

## PARETEUM'S CODE OF CONDUCT

82.    The Company's Code of Business Conduct (the "Code of Conduct") provides that all Pareteum employees, management, and members of the Board are required to:

- Read and understand the Code;

- Sign a written acknowledgement that they have done so; and
- Ensure that their conduct fully meets with the Code and;
- Report any violation of this Code of which [they] become aware.

83.    The Code of Conduct provides, as to "Legal Compliance and the Code," that:

The Company actively promotes compliance with all laws, rules and regulations in each jurisdiction in which we do business.

On top of legal compliance, the Code puts additional requirements on all of us. We place particular demands on our managers. They must, through their actions demonstrate the importance of compliance with the Code. Leading by example is critical, acting on any suspected unethical behaviour, as well as being available for employees who have ethical questions or wish to report possible violations.

Similar to breaking laws resulting in disciplinary action by society, failure to comply with the Code will result in disciplinary action by the company, including dismissal.

84.    The Code of Conduct provides, as to "Financial Reporting," that:

As a public company it is necessary that the Company's filings with the United States Securities and Exchange Commission are accurate and timely. The Company has appropriate internal controls and processes to ensure that accounting and financial reporting complies with applicable legislation and rulings.

The Company expects employees and officers to take this responsibility very seriously and provide prompt and accurate answers to inquiries related to the Company's public disclosure requirements.

The Company's policy is to comply with all financial reporting and accounting regulations and rulings applicable to the Company if any employee or officer has concerns or complaints regarding accounting or auditing matters of the Company, then he or she is encouraged to file those concerns by one of the methods described in chapter Reporting Violations.

The integrity of the Company's financial records is critical to the operation of the Company business and is a key factor in maintaining the confidence and trust of our shareholders. We must ensure that all transactions are properly recorded, classified and summarized in accordance with the Company accounting policies. No employee may enter or remove information of the Company's books or records that intentionally hides, misleads or disguises the true nature of any financial or non financial transaction or result.

Employees involved in financial reporting shall always provide full, fair, accurate, timely and understandable disclosure in reports and documents that the Company

files with, or submits to, government agencies, tax authorities and in other public communications.

Comments about financial performance and prospects to external parties shall only be made by authorized official spokespersons.

85.     The Code of Conduct provides, as to "Investor Relations," that:

It is very important that the information disseminated about the Company be both accurate and consistent. For this reason, all matters relating to the Company's internal and external communications are handled by our CEO (or, if retained for such purpose, a public relations consultant). Our CEO (or a public relations consultant retained by the Company) is solely responsible for public communications with stockholders, analysts and other interested members of the financial community. Our CEO (or a public relations consultant retained by the Company) is also solely responsible for our marketing and advertising activities and communication with employees, the media, local communities and government officials. Our CEO serves as the Company's spokesperson in both routine and crisis situations

86.     The Code of Conduct provides, as to "Reporting Concerns," that:

The Company has designated the General Counsel of the Company, Mr. Alexander Korff, to administer this Code. Employees, officers or directors, at their discretion, may make any report or complaint provided for in this Code to the General Counsel. The General Counsel will refer complaints submitted, as appropriate, to the Board of Directors or an appropriate Committee of the Board. In case someone would not be comfortable to report in such a way or in case the matter involves the General Counsel, this person can instead take contact with the Chairman of the Audit Committee of the Board of Directors of the Company.

Reports can be filed anonymously. Each and every report will be promptly investigated. The reporting person will be informed of the investigation's results, provided he/she has provided contact information. For further information, please see the Company's Whistleblower Policy.

87.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to

maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

88.     Pareteum is a software company that provides global cloud communications services. Pareteum purports to offer voice, video, text messaging, and data services to its customers, which include early stage businesses, software developers, and communications service providers.

89.     Prior to November 2015, the Company, then known as Elephant Talk Communications Corp., was a declining penny stock company with few positive business prospects. This began to change on November 12, 2015, when Defendant Turner was appointed as the Company's executive Chairman of the Board.

90.     Defendant Turner's appointment heralded a significant restructuring of the Company, which included the rebranding of the Company as Pareteum, a 1-to-25 reverse stock split of the Company's common stock, and the appointment of Defendant Bozzo as CEO of the Company in November 2016. Following these developments, the Company's market cap expanded significantly, from less than $20 million during December 2016, to as much as $569 million during May 2019.

91.     During this period, and continuing through the Relevant Period, a substantial part of the Company's reported revenue was formed by its revenue backlog, which consisted of revenue purportedly owed to the Company through its contracts with customers. For instance, for the fiscal year ended December 31, 2017, the Company's backlog totaled $147 million, which ballooned to $615 million during the fiscal year ended December 31, 2018. The Company defines its backlog as follows:

Contractual revenue backlog, a Non-GAAP measure is measured on a forward looking 36 month snapshot view monthly, and, is generated by each of the Company's Managed Services, Global Mobility Cloud, and Application Exchange & Developer's Platform customers.

92.     According to the Marcus Aurelius Report, many of the customers who purportedly contributed to the Company's backlog during the Relevant period were either greatly exaggerated or completely fictitious.[2] Examples of these customers include European and African companies with little to no capital or meaningful business activity, businesses with inactive websites that offered limited contact information, and businesses that are outright closed or dissolved.

**The Individual Defendants' Duty to Disclose**

93.     Under applicable SEC rules and regulations, public companies, such as Pareteum, are required to file financial statements that are prepared in accordance with GAAP. Financial statements that are not in compliance with GAAP are presumed misleading by the SEC.

94.     The SEC recognizes the Financial Accounting Standards Board ("FASB"), as the authoritative source of GAAP. The FASB provides guidance as to which economic phenomena should be recognized and recorded in financial statements and related reports or communications in the FASB Statements of Financial Accounting Concepts (the "Concepts Statements").

95.     Concepts Statement No. 1 provides that "[f]inancial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions." FASB Concepts Statement No. 1, *Objectives of Financial Reporting by Business Enterprises* (2008) at 11.

96.     Concepts Statement No. 1 also provides that "[f]inancial reporting should provide information about an enterprise's financial performance during a period." *Id.* at 13.

---

[2] http://aureliusvalue.com/research/teum-where-are-the-customers/ (last visited October 30, 2019).

97.     Concepts Statement No. 2 provides that "[t]he reliability of a measure rests on the faithfulness with which it represents what it purports to represent, coupled with an assurance for the user, which comes through verification, that it has that representational quality." FASB Concepts Statement No. 2, *Qualitative Characteristics of Accounting Information* (2008) at 18.

98.     Concepts Statement No. 2 also provides that for a financial report to be complete, "nothing material is left out of the information that may be necessary to insure that it validly represents the underlying events and conditions." *Id.* at 21.

99.     Additionally, Concepts Statement No. 2 provides that "[c]onservatism is a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered." *Id.* at 24.

100.    The Company's revenue backlog comprised a significant portion of the total revenue reported by the Company during the Relevant Period. However, the Individual Defendants failed to disclose, in any of the financial statements issued by the Company during the Relevant Period, that the Company was unlikely to collect revenue from certain of the customer transactions that materially contributed to the Company's backlog. As such, the Individual Defendants caused Pareteum's financial statements to be in violation of GAAP during the Relevant Period.

101.    Moreover, SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies with respect to their finances and operations. Specifically, Item 303 of Regulation S-K requires that all Form 10-Qs and 10-Ks filed with the SEC include a "Management's discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") section. Item 303(a)(3) provides that the MD&A section must:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or

expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

Describe any known trends or uncertainties that have had or that the   registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

102.    As such, the Individual Defendants had a duty under Item 303 of Regulation S-K

to disclose that the Company was unlikely to collect revenue from certain customer transactions,

as these transactions constituted (i) unusual transactions or significant economic changes

materially affecting the Company's reporting income, and (ii) known trends or uncertainties that

have had or should be reasonably expected to have a material impact on the Company's revenue

or income.

## False and Misleading Statements

### December 14, 2017 Letter to Shareholders

103.    On December 14, 2017, the Company published a letter to shareholders from

Defendant Turner on its website. The letter stated the following, in relevant part:

> ***2017 Accomplishments Expected to Create Continued Growth and Market Innovations in 2018***
> ***36 Month Contractual Revenue Backlog Grows to $129 Million at November 30, 2017***
>
> * * *
>
> These past two years, since I was appointed as Executive Chairman and Principal Executive Officer of Pareteum in November 2015, have been extremely eventful and successful. ***Our restructuring and repositioning in 2016 has led to solid growth in 2017, and has defined our innovation in both services and market positioning, establishing a strong outlook for our success in 2018 and beyond***. We again thank you for your patience.
>
> * * *

Through TEUM's accretion of the current $129 million 36 Month Contractual Revenue Backlog (see definition below), our customer base increased from 4 as of year-end 2016 to currently 21 customers. ***This is the result of a strong TEUM effort by all our TEUMates, across all departments, including Vic Bozzo, Rob Mumby, Nick Barter, Eduardo Gimeno, Ali Davachi, Ted O'Donnell and many others that carry on every day, doing their jobs to serve our customers and create profitable growth***. We have expanded into new markets and have provided new services as a result of the complete overhaul of our software and platform in order to fully support our Software as a Service business model, which we converted to in 2016.

(Emphasis added).

### December 19, 2017 Press Release and PowerPoint Presentation

104.   On December 19, 2017, the Company issued a press release stating that on December 18, 2017, the Company paid off the remaining balance on a senior secured loan, which "substantially improve[d] cashflow." The press release quoted Defendants Turner, who stated:

Our successful Debt repayment is one of the key elements of the corporate turnaround at Pareteum which began in Q4 2015. This debt financing package, originally implemented by the Company's former management, was no longer optimized for the exciting value-generating and growth stage of our business plans. We thank the Lenders for their support during the challenging restructure period. We also look forward to focusing on the continued sales surge by making investments in the business which we expect to deliver maximum value for our equity investors.

105.   That same day, the Company also published a PowerPoint Presentation, which disclosed that the Company had issued over $13 million in new revenue backlog, and stated, "[the Company's] [p]ath to profitability is accelerated via high margins on subscribers and the magic of monthly recurring revenue will drive sustainable returns."

106.   The price of the Company's stock shot up as a result of this news, from $0.72 per share at the close of trading on December 14, 2017, to $1.65 per share at the close of trading on December 19, 2017.

### December 26, 2017 Press Release

107.    On December 26, 2017, the Company issued a press release stating that the Company had added support for blockchain technology to the Company's billing and settlement services. The press release stated the following:

> The new feature being offered to all Pareteum's Global Mobility Cloud customers will allow them to not only accept the crypto-currencies but also to perform payment processing and settlements with their partners in any currency. For example, in the case of Smart Cities in emerging markets, creation of their own local crypto-currencies is now a reality, facilitating primary economic benefit with the cities for their citizens. Last year, Pareteum announced a partnership with Airfox to integrate their advertising subsidy platform into the Application Exchange and Developer's Platform exchange based on the requirement for advertising to subsidize the costs of growing data service usage. Since then subsidies have gone beyond advertising and into micro-loans and cryptocurrency as the mobile phone penetrates more of daily life.

108.    The press release also quoted Defendant Turner, who stated the following:

> We have sold solutions that take us, through our cloud services, into Smart Cities and cryptocurrency payment capabilities. It's not hard to imagine that we can live in an entire digital universe where all of our transactions may be managed through your own personal mobile phone, with secure identity management and digital payments. In thinking about this scenario, where essentially your mobile phone is your bank, without bricks and mortar, it's possible that throughout the day you may have earned enough digital currency through your transactions to be rewarded with that coffee or snack or phone minute or that extra megabyte of data. We envision a time in the not too distant future when Pareteum could create its own currency payments and settlements among the millions of subscribers on its platform globally. As we consider the new global mobile landscape, and Pareteum's service and capabilities developments in 2017, which have opened doors for us in the Internet of Things (IoT), Smart Cities, and use of Artificial Intelligence (AI) and Machine Leaning (ML) creating predicative analytics for the vast amounts of digital data we are capable of securely processing, we maintain an optimistic view towards 2018 and beyond.

### *January 2, 2018 Press Release*

109.    On January 2, 2018, the Company issued a press release stating that the Company had expedited the deployment of its services in connection with a $3 million contract with an Indian customer. The press release quoted Defendant Turner, who stated the following:

Service providers in India and the Indian subcontinent are seeking ways to ensure mobile access for their subscribers, to accelerate new services and innovation, and to serve their subscriber community, wherever they are in the world. Our first India located customer chose Pareteum because of our feature rich global platform and connectivity, with its developer Application Programming Interfaces (API) framework. Pareteum's selection was based on the profitable customer value derived from our cloud, its connectivity, and the ease of doing business with us. Now, with our newly supported mobile payments and Blockchain capabilities plus their expectation of future mobile services and capabilities, ranging from Artificial Intelligence (AI), Machine Learning (ML) and Internet of Things (IoT), we expect to grow with our customer in India, and everywhere they choose to do business.

***January 22, 2018 Press Release***

110.    On January 22, 2018, the Company issued a press release stating that the Company had expanded its relationship with AirFox, a blockchain technology company, by incorporating certain of AirFox's platforms into the Company's software platform. The press release quoted Defendant Turner, who stated the following:

Pareteum and AirFox form a highly complementary technology partnership. These new converged services, centered on the security offered via Blockchain and Pareteum's open source developed award winning software services for communication service providers, extend TEUM's s abilities for person to person mobile payments, that are trusted. We see new markets, faster services adoption and deeper market penetration occurring, as well as our inevitable march toward cloud based self-services, utilizing our insights gleaned from data analytics, for everything. This bodes well for our partners AirFox and for Pareteum, in fundamental revenue growth and profitability.

111.    The press release also quoted Defendant Bozzo, who stated the following:

As we forge further into underserved markets, the advantage of the new Internet paradigm shift in mobile allows investors to crowdsource regional opportunities that were previously reserved for local services only.

***January 31, 2018 Press Release***

112.    On January 31, 2018, the Company issued a press release announcing that it had signed contracts scheduled to add $15.2 million to the Company's backlog. The press release stated the following:

[D]uring the month of January 2018, the Company signed contracts scheduled to add $15,200,000 to its 36-month contractual revenue backlog. The current contractual revenue backlog represents a 400% increase from a year earlier and a 10% month over month increase to the $147,000,000 36-month contractual revenue backlog announced previously on January 3, 2018.

Pareteum's current cash balance is $15.6 million on January 31, 2018, reflecting having fully paid our senior secured loan, in the amount of $8.1 million, and, continuing the improved operations of the business. Increases in cash balances over prior periods are a result of net equity raised, warrant exercises and continued operational efficiencies. The improved strength of our balance sheet provides the foundation for Pareteum's focus on accelerated growth in 2018 and beyond.

Contracts executed in January 2018 that have meaningfully contributed to Pareteum's accelerating growth, as measured by our 36-month contractual revenue backlog, are:

- $1,000,000 contract from Social Media Provider to Enable Smartphone Services, announced January 4, 2018
- $5,400,000 contract from Pan European Mobile Operator with African Subscribers, announced January 10, 2018
- $3,000,000 contract from South America Data Network Provider to Add Mobility, announced January 17, 2018
- $1,000,000 contract from Brazil Mobile Service Provider, announced January 24, 2018
- $10,000,000 contract awarded to Pareteum Europe for MSP deployment to EMEA customer, announced January 26, 2018

113.    The press release also quoted Defendant Turner, who stated, "Pareteum's performance is highlighted by the growth of our 36-month contractual revenue backlog, currently standing over $162,000,000, which represents a Compound Annual Growth Rate (CAGR), measured from the end of 2016's fourth quarter through 2017 of 400%!"

***February 6, 2018 Press Release***

114.    On February 6, 2018, the Company issued a press release stating that the Company was exploring new opportunities with respect to blockchain technology and the broader communications market. The press release quoted Defendant Turner, who stated the following:

The Digital Economy, and its monetization, requires trust, identity and device, identification, for the dependable completion of transactions. These transactions

may be payment system, financial, or application and content focused. Pareteum's support of an enabling Blockchain powered solution assures that our communications service provider customers, and, their retail, enterprise, and IoT customers, are provided the highest available, GDPR compliant, security and payment systems solutions. In conjunction with our partner, AirFox, Pareteum's cloud platform will also service its customers by capturing new revenue streams in the telecommunications and IoT markets. Our cloud-based solution will enable the deployment of Blockchain services, delivered for our customers anywhere in the world.

***February 12, 2018 Letter to Shareholders and Press Release***

115.    On February 12, 2018, the Company published a letter to shareholders from

Defendant Turner on its website, which stated the following:

The TEUM of Pareteum Corporation continues to be hard at work, globally. We have had **a fast start to 2018 with excellent results in January** through the collective group initiatives of:

- Rob Mumby + his key sales executives and sales support TEUM;
- Ali Davachi + his key operations, technical support and service delivery TEUM;
- Denis McCarthy + his key corporate development TEUM;
- Ted O'Donnell + his accounting and finance TEUM
- And, as always, Vic Bozzo and his indomitable leadership, especially in the sales arena, to make things happen;

I am happy to report that our executive team, with its key leadership management team, is continuing to produce results. We have a very big and bright 2018 planned. So far this year, in January alone, our TEUM signed $20.4 million of new contracts, spanning the globe, from Brazil to Africa to Europe. $15.2 million was additive to our now record high $162 million 36-month contractual revenue backlog, as two of the awarded contracts are 5-year agreements. I am extremely proud of our TEUM's accomplishments **as we have accelerated the growth of our backlog from $60 million at June 30, 2017 to $162 million as of January 31, 2018. We expect the pace to accelerate during the year and that our reported results will reflect the hard work that has gone into the turnaround of our company.**

\* \* \*

We are proud to be debt-free with substantial cash to operate and grow our business. **We are putting these dollars to work throughout 2018 (and beyond) in a manner that we believe will yield the maximum shareholder value to TEUM** through:
- Profitable Sales growth

- Product and services development, with a detailed build or buy analysis applied

***Pareteum continues to win new long-term contractual business at an unprecedented pace, as evidenced by our 36-month contractual revenue backlog. We expect this pace to increase throughout the year***.

(Emphasis added).

116.    The letter also included a link to a presentation discussing the Company's backlog, which contained the following graphic:



117.    Shortly after, also on February 12, 2018, the Company issued a press release stating, "Pareteum (NYSEMKT:TEUM) is up 4.8% premarket following on a letter from its chairman outlining its start to 2018."

***February 28, 2018 Press Release***

118.    On February 28, 2018, the Company issued a press release stating that the Company had been awarded a 3-year contract with Global Cloud Services, which would add over $10 million to the Company's backlog. The press release quoted Defendant Bozzo as stating, "[t]his contract is a major milestone for continued growth. Being awarded this contract demonstrates that the

technology and strategy of Pareteum's turn-key solution for launching mobile network operators is being widely adopted across the globe."

119.    On this news, the price of the Company's stock increased from $2.00 per share at the close of trading on February 27, 2018, to $2.28 per share at the close of trading on February 28, 2018.

### March 21, 2018 Press Release

120.    On March 21, 2018, the Company issued a press release stating that the Company had been awarded a 5-year contract with an Africa-based Mobile Virtual Network Operator, which would add another $10 million to the Company's backlog. The press release quoted Defendant Bozzo as stating, "Pareteum's MSP Platform is a perfect fit for the contract with our newest global client. This part of the world represents high growth in connections as the digital economy takes over. We are pleased with Rob Mumby and his team as they continue to add customers to our platform."

121.    On this news, the price of the Company's stock increased from $2.85 per share at the close of trading on March 20, 2018, to $3.35 per share at the close of trading on March 21, 2018.

### March 30, 2018 Form 10-K

122.    On March 30, 2018, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2017 with the SEC (the "2017 10-K"). The 2017 10-K was signed by Defendants Turner, O'Donnell, Bozzo, Jimenez-Tuñon, Thomas, and van Sante, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Turner and O'Donnell attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the

Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

123.    For the fiscal year ended December 31, 2017, the 2017 10-K reported revenue of over $13.5 million, representing an increase of 5% over the fiscal year ended December 31, 2016. With respect to the Company's policies on revenue recognition, the 2017 10-K stated the following:

> For the mobile solutions services the Company recognizes revenues from customers accessing our cloud-based application suite in two different service offerings, namely managed services and bundled services.
>
> For managed services, revenues are recognized for network administration services provided to end users on behalf of Mobile Network Operators (MNO) and virtual Mobile Network Operators (MVNO's). Managed service revenues are recognized monthly based on an average number of end-users managed and calculated on a pre-determined service fee per user. For bundled services, the Company provides both network administration as well as mobile airtime management services. Revenues for bundled services are recognized monthly based on an average number of end-users managed and mobile air time and calculated based on a pre-determined service fee. Technical services that meet the criteria to be separated as a separate unit of accounting are recognized as the services are performed. Otherwise they are deferred and recognized over the contract term. Our arrangements with customers do not provide the customer with the right to take possession of the software supporting the cloud-based application service at any time.
>
> Telecommunication revenues were recognized when delivery occurred based on a pre-determined rate and number of user minutes and number of calls that the Company has managed in a given month.
>
> Professional services and other revenue include fees from consultation services to support the business process mapping, configuration, data migration, integration and training. Amounts that have been invoiced are recorded in accounts receivable and in net billings in excess of revenues or revenue, depending on whether the revenue recognition criteria have been met. Revenue for professional and consulting services in connection with an implementation or implantation of a new customer that is deemed not to have stand-alone value is recognized over the contractual period commencing when the subscription service is made available to the customer. Revenue from other professional services that provide added value such as new features or enhancements to the platform that are deemed to have standalone value to the customer or are sold separately from the original hosting

arrangement, are deferred and revenue recognition occurs when the feature is activated.

124.     In a section titled, "Controls and Procedures," the 2017 10-K stated the following:

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to management, including our interim chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosures. Our management, with the participation of our principal executive officer and chief financial officer (our principal financial officer), has evaluated the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 131-15(e) and 15d-15(e)) as of December 31, 2017. Based on that evaluation, our management concluded that our disclosure controls and procedures were effective as of December 31, 2017.

* * *

There have been no changes in our internal control over financial reporting during the quarter ended December 31, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

125.     The statements made in the 2017 10-K with respect to the Company's internal controls over financial reporting were false and misleading, because they failed to disclose that the Company did not maintain adequate internal controls.

**April 9, 2018 Press Release**

126.     On April 9, 2018, the Company issued a press release stating that the Company expected to report at least $4.1 million in revenue for the fiscal quarter ended March 31, 2018, representing 47% growth. The press release quoted Defendant Turner, who stated the following:

Our TEUM ended the 2017 year with a very strong fourth quarter as demonstrated by the acceleration in revenues. This momentum led to a robust first quarter of 2018 with continued year-over-year growth expected throughout the year. This momentum is a result of our success in converting our contract revenue backlog into connections which generates revenues.

**April 16, 2018 Letter to Shareholders**

127.    On April 16, 2018, the Company published a letter to shareholders from Defendant Turner on its website, which stated, "Pareteum is on to a rapid start for 2018 in all meaningful areas." The letter also stated, in relevant part, the following:

> We have continued to experience financial improvements during the first few months of 2018. With our Software-as-a-Service (SaaS) business model, we have excellent visibility into our business operations and revenue recognition. This enabled us to pre-announce our first quarter, ended March 31, 2018 revenue, of $4.1 million, just a week after the quarter's ended, and, which represents 47% growth for the first quarter ended March 31, 2018.This is significant because it represents a reversal of the prior year's Q1 seasonal revenue decrease, and a sequential quarter over quarter revenue increase. This reflects the increasing role our Global Cloud is playing in revenue contribution, and, its ongoing potential. It is also significant that "connections" (our term representing devices, subscribers and their variable usage), which are a lead indicator of revenue, rose to 2,220,000 as of March 31, 2018. This connections growth of 94% versus the end of the first quarter 2017 and 30% from the sequential fourth quarter of 2017, gives management confidence.

### *May 11, 2018 Form 8-K*

128.    On May 11, 2018, the Company filed a current report on Form 8-K with the SEC (the "May 2018 8-K"), which contained a press release disclosing Pareteum's financial results for the fiscal quarter ended March 31, 2018. The May 2018 8-K reported revenue of $4.113 million, and stated the following, in relevant part:

**Key Business Highlights for First Quarter 2018:**

- Awarded 14 contracts aggregating to $60 million in total contract value, which added $53 million to 36-month contractual revenue backlog
- Increased 36-month contractual revenue backlog from $147 million at 12/31/17 to $200 million
- Backlog revenue conversion at 103%
- Non-GAAP EPS of $0.02 cents
- Ended Q1 2018 with 2,200,000 connections, a lead indicator of revenue, increased 94% versus the end of the first quarter 2017 and 30% from the sequential fourth quarter of 2017, with an additional conversion increase of 70% versus the expected in the 36-month contract backlog for connections

* * *

**Raised 2018 Outlook to At Least 60% Revenue Growth2018 Outlook:**

Based on our 36-month contractual revenue backlog of $200 million, as of March 31, 2018, and 2,200,000 connections, we are raising our 2018 outlook. The Company now expects 2018 revenue growth of at least 60% over 2017, up from the previous provided guidance of 50%. Also, with its current cost structures, Pareteum expects positive, EBITDA, and cash from continuing operations for the full year 2018. As we convert backlog to connections, our revenue will increase and for every incremental dollar of revenue, we expect contribution to our bottom line. Our target gross margins are 70-75%.

129.    The May 2018 8-K also quoted Defendant Turner, who stated the following:

This quarter represents a record quarterly revenue milestone since we executed our turnaround and transformed the business in 2016. I am also extremely pleased and proud to report that we generated positive operating cash flow in the first quarter, a full quarter earlier than expected. First quarter revenue would have been $4.22 million, but we instituted Accounting Standard for Revenue Recognition (606) for our SaaS business model and did not recognize $107,000 of deferred revenue in the first quarter. All of our profitability metrics improved dramatically; Adjusted EBITDA, EBITDA, operating loss and cash flow from operations. Key performance indicators of connections, backlog conversion, connection values, revenue per employee and churn continue to all move in the right direction and give us confidence in our overall strategy and business execution. We also invested in product development and sales and marketing during the quarter, as we prepare to scale our business for expected growth and profitability. Our TEUM remains laser focused on converting backlog to revenue, servicing our clients, selling into new geographical markets and creating shareholder value.

(Emphasis in original).

### *May 11, 2018 Form 10-Q*

130.    Also on May 11, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2018 with the SEC (the "May 2018 10-Q"). The May 2018 10-Q was signed by Defendants Turner and O'Donnell, and contained SOX certifications signed by Defendants Turner and O'Donnell attesting to the accuracy of the May 2018 10-Q.

131.    The May 2018 10-Q reaffirmed the financial results contained in the May 2018 8-K, and stated the following with respect to the Company's controls and procedures:

**Item 4. Controls and Procedures**

<u>Evaluation of Disclosure Controls and Procedures</u>

As of March 31, 2018, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Principal Executive Officer and Principal Financial and Accounting Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934. Based on the evaluation, the Company's Principal Executive Officer and Principal Accounting Officer have concluded that the Company's disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms and is accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure.

<u>Changes in Internal Control Over Financial Reporting</u>

On January 1, 2018, the Company adopted ASC Topic 606, "Revenue from Contracts with Customers" and other than this change and related update to the Company's internal controls, there have been no additional changes in the Company's internal control over financial reporting that occurred during the Company's fiscal quarter ended March 31, 2018 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

(Emphasis in original).

132.    The statements made in the May 2018 10-Q with respect to the Company's internal controls over financial reporting were false and misleading, because they failed to disclose that the Company did not maintain adequate internal controls.

133.    With respect to the Company's compliance with GAAP, the May 2018 10-Q stated the following:

The interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States, or GAAP, for interim financial information and with the instructions to Securities and Exchange Commission, or SEC, Form 10-Q and Article 10 of SEC Regulation SX. They do not include all the information and footnotes required by GAAP for complete financial statements. Therefore, these financial statements should be read

in conjunction with our audited consolidated financial statements and notes thereto for the year ended December 31, 2017, included in our 2017 Annual Report on Form 10-K filed with the SEC on March 30, 2018, referred to as our 2017 Annual Report.

The interim condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly our results of operations and financial position for the interim periods. The results of operations for the three months ended March 31, 2018 are not necessarily indicative of the results to be expected for future quarters or the full year.

### *July 10, 2018 Press Release*

134.    On July 10, 2018, the Company issued a press release stating that the Company expected to report at least $5.75 million in revenue for the fiscal quarter ended June 30, 2018, representing 78% growth. The press release stated the following:

[T]he Company expects to report revenues of at least $5.75 million which represents approximately 78% growth for the second quarter ended June 30, 2018, as compared to a year ago. The second quarter's expected 2018 revenues will represent an approximate 40% sequential growth over the first quarter of 2018, demonstrating the strong growth in connections that was previously reported in the first quarter of 2018.

135.    The press release also quoted Defendant Turner, who stated the following:

[We] surged into 2018 with strong first quarter results, demonstrated by the acceleration in revenues and connections. This momentum has continued into the second quarter, at an accelerating rate, because of rapid conversions of our 36 Month Contractual Revenue Backlog. We see this translating into our best quarter, ever. We anticipate continued improvement in our results and execution of our long-term strategies, aimed at open mobility and open applications, globally delivered as part of excellent customer experiences in every engagement.

### *August 2, 2018 Press Release*

136.    On August 2, 2018, the Company issued a press release stating that the Company's backlog had grown to over $300 million. The press release stated the following:

[The Company] announced today that its current 36-Month Contractual Revenue Backlog (36MCRB) has grown to an astonishing $301 Million. Pareteum has added $46 Million to its 36MCRB with ten (10) new customer agreements the last 36

days. Achieving this tremendous milestone represents a 393% increase from a year earlier, when in July 2017, our 36MCRB was $61 million.

137.    The press release also quoted Defendant Turner, who stated the following:

Our customers are telling us that 'telecom needs to change'. We have been listening. We are 'software', and, that is what has changed, and will even more disruptively continue to change how we receive content and communicate. Pareteum, and, its Global Software Defined Cloud, have made dramatic leaps forward in fulfilling our vision of software-driven open mobility and applications that make our customers happy. The evidence is clear in the number of new contracts being signed and the rate at which customers are subscribing to our software services. This latest triumph delivers on what we said we would do, and the results show it. We are a force to be reckoned with. Our momentum will not stop here: our vision to provide connectivity for *Any Device, Any Network, Anywhere*™, continues to disrupt the industry. **We are on a torrid sales pace and we are On Fire with relentless forward motion and passion** for customers and meeting their global service needs.

(Emphasis in original).

### *August 3, 2018 Proxy Statement*

138.    On August 3, 2018, the Company filed the 2018 Proxy Statement. Defendants Turner, Jimenez-Tuñon, Thomas, and van Sante solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

139.    With respect to the Company's Code of Conduct, the 2018 Proxy Statement stated, "[t]he code of conduct applies to all employees, as well as each member of our Board of Directors. All employees are required to read the code of conduct and affirm in writing their acceptance of the code."

140.    The 2018 Proxy Statement also called for shareholder approval of, among other things, the Company's 2018 Long-Term Incentive Compensation Plan (the "2018 Incentive Plan"),

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

which would authorize the Company to reserve 8 million shares of Company stock to be issued to the Company's executive officers and directors, with an annual 15% increase in the number of reserved shares.

141. The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

142. The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company was unlikely to collect revenue from certain customer transactions; (2) the Company improperly recognized revenue in its financial statements from these customer transactions, in violation of GAAP; (3) as a result, the Company's revenue backlog and accounts receivable were artificially inflated; and (4) the Company would ultimately need to restate each of its financial statements issued during the fiscal year ended December 31, 2018, and for the fiscal quarters ended March 31, 2019 and June 30, 2019. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

143. As a result of the material misstatements and omissions contained in the January 2018 Proxy Statement, Company shareholders approved the 2018 Incentive Plan.

***August 6, 2018 Press Release***

144. On August 6, 2018, the Company issued a press release disclosing the Company's financial results for the fiscal quarter ended June 30, 2018. The press release stated the following:

**Key Financial Highlights for Second Quarter 2018 Year over Year:**

- Revenues increased by 85% to $6 million
- Net Income of $1.7 million versus net loss of ($1.3 million) in the second quarter of 2017
- EBITDA improved by over $898K, or 298%, to $597,263

- Adjusted EBITDA improved by over $834K, or 180%, to $1.3 million
- Operating loss reduced by $776K, or 66%, to $397K
- Increase in total assets from $11.6 million to $33.1 million
- Cash balance of $19.2 million
- Operating cash flow adjusted for restructuring and acquisition related costs of $565 for the six months ended June 30, 2018
- Initiated reporting on dollar based expansion rate where customers of record in 2017 have grown their revenue dollar spending by 161% in Q2 vs Q1

**Key Business Highlights for Second Quarter 2018:**

- Awarded 13 contracts aggregating to $55 million in total contract value, which added $55 million to 36-month Contractual Revenue Backlog
- Increased 36-month Contractual Revenue Backlog from $200 million at End of the first quarter of 2018 to $276 million; includes $21 million incremental from existing contracts
- Contractual Revenue Backlog conversion rate at 106%
- Ended the second quarter of 2018 with 2,713,600 Connections, an increase of 225% over the end of the second quarter of 2017 and 23% higher than the first quarter of 2018

(Emphasis in original)

145.    The press release also quoted Defendant Turner, who stated the following:

The quarter ended June 30, 2018, marks the achievement of materially significant milestones for Pareteum as it continues to evolve into a high-growth, software-based, enabling cloud services company. Our results include attainment of positive Net Income and positive EBITDA for the first time in Company history. Surpassing $6 million in revenues in the second quarter demonstrates the efficiency of our employees in converting our Contract Revenue Backlog into revenue. Today we operate with our Global Enablement Cloud, fueled by the award winning, and, customer affirmed, software applications, solutions and application programming interfaces (APIs). It is this combination that is making our services and software the developer community's first choice for connectivity and communications. We generated positive EBITDA and Net Income, validating the efficient scalability of our business. We are continuing to grow our revenues, clearly seen in our results as we are driving financial performance and cash to the bottom line. Key performance indicators of Connections, Contract Revenue Backlog conversion, Connection values, revenue-per-employee and churn continue to all move in the right direction and give us confidence in our overall strategy and business execution. Our TEUM remains laser focused on converting backlog to revenue, servicing our clients, selling into new geographical markets and creating shareholder value.

***August 13, 2018 Form 10-Q***

146.    On August 13, 2018, the Company filed its quarterly report on Form 10-Q for the

fiscal quarter ended June 30, 2018 with the SEC (the "August 2018 10-Q"). The August 2018 10-

Q was signed by Defendants Turner and O'Donnell, and contained SOX certifications signed by

Defendants Turner and O'Donnell attesting to the accuracy of the August 2018 10-Q.

147.    The August 2018 10-Q reaffirmed the financial results contained in the press

release issued by the Company on August 6, 2018, and reported over $6 million in unaudited

revenue, representing an 85% increase over the Company's revenue for the fiscal quarter ended

June 30, 2017.

148.    With respect to the Company's disclosure controls and procedures, the August 2018

10-Q stated the following:

**Item 4. Controls and Procedures**

Evaluation of Disclosure Controls and Procedures

As of June 30, 2018, the Company carried out an evaluation, under the supervision
and with the participation of the Company's management, including the
Company's Principal Executive Officer and Principal Financial and Accounting
Officer, of the effectiveness of the design and operation of the Company's
disclosure controls and procedures, as defined in Rule 13a-15(e) and 15d-15(e) of
the Securities Exchange Act of 1934. Based on the evaluation, the Company's
Principal Executive Officer and Principal Accounting Officer have concluded that
the Company's disclosure controls and procedures are effective to ensure that
information required to be disclosed by the Company in the reports it files or
submits under the Securities Exchange Act of 1934 is recorded, processed,
summarized and reported within the time periods specified in Securities and
Exchange Commission rules and forms and is accumulated and communicated to
our management as appropriate to allow timely decisions regarding required
disclosure.

Changes in Internal Control Over Financial Reporting

On January 1, 2018, the Company adopted ASC Topic 606, "Revenue from
Contracts with Customers" and other than this change and related update to the
Company's internal controls, there have been no additional changes in the
Company's internal control over financial reporting that occurred during the
Company's fiscal quarter ended March 31, 2018 that has materially affected, or is

reasonably likely to materially affect, the Company's internal control over financial reporting.

149.    The statements made in the August 2018 10-Q with respect to the Company's internal controls over financial reporting were false and misleading, because they failed to disclose that the Company did not maintain adequate internal controls.

150.    With respect to the Company's compliance with GAAP, the August 2018 10-Q stated the following:

> The interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States, or GAAP, for interim financial information and with the instructions to Securities and Exchange Commission, or SEC, Form 10-Q and Article 10 of SEC Regulation SX. They do not include all the information and footnotes required by GAAP for complete financial statements. Therefore, these financial statements should be read in conjunction with our audited consolidated financial statements and notes thereto for the year ended December 31, 2017, included in our 2017 Annual Report on Form 10-K filed with the SEC on March 30, 2018, referred to as our 2017 Annual Report.

> The interim condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly our results of operations and financial position for the interim periods. The results of operations for the three and six months ended June 30, 2018 are not necessarily indicative of the results to be expected for future quarters or the full year.

### *September 17, 2018 Press Release and Tweet*

151.    On September 17, 2018, the Company issued a press release stating that the Company had entered into new contracts worth a total of $50 million in August 2018. The press release quoted Defendant Turner, who stated the following:

> Customers are accelerating new revenues and substantial savings in ever increasing numbers. It is Pareteum's Global Software Defined Cloud, with its SuperAPI that makes this possible, affordably for our customers. We have assembled a first class sales executive organization, led by Rob Mumby and Vic Bozzo, who with their colleagues are empowering Pareteum customers with disruptive and innovative solutions, every day. This is how we deliver new services creation, enabling new

revenues, and operational efficiencies. Our customers' inevitable business growth and competitiveness is why they keep signing new agreements.

152.   That same day, Defendant Turner made a post on his twitter account promoting the Company's contract with Eyethu Mobile Network, one of the Company's new customers, as follows:



***October 2, 2018 Press Release***

153.   On October 2, 2018, the Company issued a press release stating that the Company had entered into three-year contracts with several new customers for over $15 million. The press release stated the following:

> [The Company] today announced that it has signed new contracts with Parallax Health Sciences in the U.S., oneCentral in the Netherlands, and Naledi in South Africa totaling $15 Million over three years. New customers will use Pareteum's cloud platform as a service offering to enable voice, mobile, and device and data-monitoring for their companies. These use cases are made possible through the recently-merged Artilium and Pareteum products.

154.   The press release quoted Defendant Turner, who stated the following:

> We celebrate every new customer that chooses Pareteum's platform to grow their business. With Parallax, oneCentral, and Naledi Telecom, we are adding mobile enablement solutions for companies that serve people across the world, and many of these people are in markets yet touched by the power of Pareteum's seamless and agile platform solution and SuperAPI.

155.   The press release also quoted Defendant Bozzo as follows:

> Pareteum's momentum continues to grow as we close on these multimillion dollar contracts," said Vic Bozzo, chief executive officer of Pareteum. "With these new use cases, we are not only building a pipeline for our growing business, but also

enabling mobile solutions for companies across industries, including the ever-important healthcare technology space.

***October 5, 2018 Press Release***

156.     On October 5, 2018, the Company issued a press release stating that the Company

expected to report at least $8 million in revenue for the fiscal quarter ended September 30, 2018,

representing 129% growth. The press release stated the following:

> [The Company] expects a minimum of $8 million in third quarter revenues. This represents an approximate 129% growth for the third quarter ended September 30, 2018, as compared to a year ago. Third quarter expected 2018 revenues will also represent an approximate 33% sequential growth over the second quarter of 2018, demonstrating the continuing strong increase in connections previously reported in the second quarter of 2018.

157.     The press release also quoted Defendant Turner, who stated the following:

> Pareteum continues to surge through 2018; with our expectation of superior financial and operating results for the third quarter. Our acceleration in revenues and connections proves it, and there's more to come. We are focused on forward momentum, and it is happening as we move into the fourth quarter. Why? Because our existing customers are buying more from us and we are signing on new ones. This sales performance, coupled with our daily-accelerating 36-Month Contractual Revenue Backlog conversion, provides a favorable outlook for our business, even before we complete the operational integration of our newly-acquired Artilium, which is also performing well. We are in a good place for our company.

***October 8, 2018 Press Release***

158.     On October 8, 2018, the Company issued a press release stating that the Company

had entered into a three-year contract with a new customer in Asia for over $50 million. The press

release stated the following:

> [The Company] today announced a $50 million contract with One Development, Thailand's first mobile virtual network aggregator and enabler, and leader in the country's growing mobile virtual network operator market. Pareteum's cloud software platform will power One Development's ability to offer a turnkey solution to the over 50 companies that have obtained a mobile virtual network operator license in Thailand.

159.     The press release quoted Defendant Turner, who stated the following:

One Development's slogan is 'We connect Thailand,' and Pareteum is at the ready to help them do that; when our customers succeed, we succeed. With One Development in Thailand, we are literally connecting to a whole new world of customers and chances to make an impact in the global platform as a service space.

***October 17, 2018 Press Release***

160.    On October 17, 2018, the Company issued a press release stating that the Company had entered into agreements with four new customers for $8 million. The press release quoted Defendant Turner, who stated the following:

I have said it before: We celebrate every new customer that chooses Pareteum's solutions to grow their business. With these new agreements, we are adding cloud platform and mobility options for companies that are changing the world through technology.

161.    Additionally, the press release quoted the Company's Chief Revenue Officer, Rob Mumby ("Mumby"), as follows:

Pareteum is excited to be at MVNO North America, where we look forward to meeting new customers like monogoto and Nextelle. Our customers are the reason Pareteum's momentum continues to grow," said Rob Mumby, chief revenue officer of Pareteum. "With these new use cases, we are not only building a pipeline for our growing business, but also showing potential customers the broad reach of our platform as a service, including smart metering and pet tech.

***October 24, 2018 Press Release***

162.    On October 24, 2018, the Company issued a press release stating that the Company's backlog had increased to $500 million, in part due to the Company's acquisition of Artilium, a software development company. The press release stated the following:

[The Company] today announced that its current 36-Month Contractual Revenue Backlog (36MCRB) has grown to $500 million; this number includes the backlog incorporated with Pareteum's recent acquisition of Artilium and excludes certain monthly recurring revenue streams deriving from that acquisition for which long-term contracts are not in place.

- This milestone for Pareteum represents a 1,150% increase year over year since 2016: at year end 2016, Pareteum announced $40 million 36MCRB;

at year end 2017, the company announced $147 million; and now, ten months into this year, Pareteum has reached $500 million in 36MCRB.

- During the same period, Pareteum's quarterly booked revenue increased by 260%.
- The company continues to convert backlog at greater than 100% of the contract schedules over the life of the agreement.

***November 7, 2018 Press Release***

163.   On November 7, 2018, the Company issued a press release disclosing the Company's financial results for the fiscal quarter ended September 30, 2018. The press release stated the following:

- Revenues of $8 Million, up 129% Year-Over-Year
- Adjusted EBITDA of $1.8 Million
- Non-GAAP EPS of $0.01
- Raised 2018 Outlook to 100% Revenue Growth
- Dollar-Based Net Expansion Rate of 147%

**Key Financial Highlights for Third Quarter 2018 Year over Year:**

- Revenues increased by 129% to $8 million
- Adjusted EBITDA improved by over $1.2 million, or 195%, to $1.8 million
- Non-GAAP Earnings Per Common Share improved to $0.01 for Q3 2018, compared to ($0.12) for Q3 2017
- Increase in total assets from $10 million to $35 million
- Cash balance of $18.9 million
- Dollar-based expansion rate where customers of record in 2017 have grown their revenue dollar spending by 147% in the third quarter of 2018 versus the third quarter of 2017

**Key Business Highlights for Third Quarter 2018:**

- Awarded 19 contracts aggregating to $403 million in total contract value, which added $127 million to 36-month Contractual Revenue Backlog
- Increased 36-Month Contractual Revenue Backlog from $276 million at end of the second quarter of 2018 to $403 million; includes $72 million incremental from existing contracts
- Contractual Revenue Backlog conversion rate at 100%
- Ended the third quarter of 2018 with 2,903,000 Connections, an increase of 127% over the end of the third quarter of 2017 and 7% higher than the second quarter of 2018

(Emphasis in original)

164.    The press release also quoted Defendant Turner, who stated the following:

The quarter ended September 30, 2018, marks our continued evolution into a high-growth, software-based, enabling cloud services company. Surpassing $8 million in revenues in the third quarter demonstrates the efficiency of our employees in converting our Contract Revenue Backlog into revenue. Our results include growth in adjusted EBITDA, which reflects the scalability of our recurring revenue SaaS business model. Subsequent to the end of the third quarter, we closed the Artilium acquisition and have been busy integrating and streamlining the businesses and eliminating redundant expenses. We are continuing to grow our revenues, clearly seen in our results as we are driving financial performance and cash to the bottom line. Key performance indicators of Connections, Contract Revenue Backlog conversion, Connection values, revenue-per-employee and churn continue to all move in the right direction and give us confidence in our overall strategy and business execution. Our TEUM remains laser focused on converting backlog to revenue, servicing our clients, selling into new geographical markets and creating shareholder value.

### *November 14, 2018 Form 10-Q*

165.    On November 14, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2018 with the SEC (the "November 2018 10-Q"). The November 2018 10-Q was signed by Defendants Turner and O'Donnell, and contained SOX certifications signed by Defendants Turner and O'Donnell attesting to the accuracy of the November 2018 10-Q.

166.    The November 2018 10-Q reaffirmed the financial results contained in the press release issued by the Company on November 7, 2018, and reported over $8 million in unaudited revenue, representing a 129% increase over the Company's revenue for the fiscal quarter ended September 30, 2017.

167.    With respect to the Company's disclosure controls and procedures, the November 2018 10-Q stated the following:

**Item 4. Controls and Procedures**

<u>Evaluation of Disclosure Controls and Procedures</u>

As of September 30, 2018, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Principal Executive Officer and Principal Financial and Accounting Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934. Based on the evaluation, the Company's Principal Executive Officer and Principal Accounting Officer have concluded that the Company's disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms and is accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure.

<u>Changes in Internal Control Over Financial Reporting</u>

On January 1, 2018, the Company adopted ASC Topic 606, "Revenue from Contracts with Customers" and other than this change and related update to the Company's internal controls, there have been no additional changes in the Company's internal control over financial reporting that occurred during the Company's fiscal quarter ended September 30, 2018 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

168.    The statements made in the November 2018 10-Q with respect to the Company's

internal controls over financial reporting were false and misleading, because they failed to disclose

that the Company did not maintain adequate internal controls.

169.    With respect to the Company's compliance with GAAP, the November 2018 10-Q

stated the following:

The interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States, or GAAP, for interim financial information and with the instructions to Securities and Exchange Commission, or SEC, Form 10-Q and Article 10 of SEC Regulation SX. They do not include all the information and footnotes required by GAAP for complete financial statements. Therefore, these financial statements should be read in conjunction with our audited consolidated financial statements and notes thereto for the year ended December 31, 2017, included in our 2017 Annual Report on

Form 10-K filed with the SEC on March 30, 2018, referred to as our 2017 Annual Report.

The interim condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly our results of operations and financial position for the interim periods. The results of operations for the three and nine months ended September 30, 2018 are not necessarily indicative of the results to be expected for future quarters or the full year.

### *February 13, 2019 Press Release*

170.    On February 13, 2019, the Company issued a press release announcing that on February 12, 2019, the Company had acquired iPass, Inc., an internet software company valued at roughly $30 million. As part of the acquisition, the Company issued approximately 9.8 million shares of Company stock, valued at $29.5 million, to shareholders, and issued 705,000 shares of Company stock, valued at $1.4 million, to Company employees. With respect to the acquisition, the press release stated the following:

> [The Company] announced today that it has accepted for exchange all shares of iPass Inc. (Nasdaq: IPAS), a provider of global mobile connectivity, and location and performance data ("iPass"), validly tendered in the previously announced tender offer by a wholly-owned subsidiary of Pareteum to acquire all of the outstanding shares of iPass for the agreed consideration of 1.17 shares of Pareteum stock for each share of iPass. The shares accepted represent approximately 66.78% of iPass's outstanding shares of common stock. The tender offer expired at 5:00 pm, New York City time, on February 12, 2019. Pareteum acquired the remaining outstanding shares of iPass's common stock through a merger of a wholly-owned subsidiary of Pareteum with and into iPass immediately following expiration of the tender offer and acceptance of the iPass shares on February 12, 2019.

171.    The press release also quoted Defendant Turner, who stated the following:

> We're delighted to announce the completion of our acquisition of iPass. We will now accelerate as one company with combined software products and services, the expansion of addressable markets and the resulting executive and operating talent. Our integration with iPass immediately grows our installed Connections base, adding marquee brands to our portfolio of customers, and it also materially enhances our software portfolio of services, and adds global access to the world's largest Wi-Fi network.

### *February 14, 2019 Press Release*

172.     On February 14, 2019, the Company issued a press release stating that the Company had entered into six new three-year agreements with customers, which had the effect of adding $15 million to the Company's backlog. The press release stated the following:

> [The Company] today announced that it closed FY2018 with six new three-year agreements with new and existing customers, worth a total of $15 million. Combined with previously announced contracts, Pareteum's 36-month contractual revenue backlog now totals $615 million. In addition, eight agreements that were announced in November and early December have been launched into production.

173.     The press release also quoted Defendant Turner, who stated the following:

> As demonstrated with our new clients, Pareteum is starting 2019 stronger than ever, growing and satisfying our customers' needs, innovating at a relentless pace ahead of others. We are in the business of inspiring and growing towards the future, operating profitably, and recognizing and believing that 'we are all in sales'.

174.     Additionally, the press release quoted Mumby, who stated the following:

> Our strong position at the end of 2018 is exceeded by further strong growth into 2019 and indicates the scale of opportunities open to Pareteum. We continue to have a strong focus on sales and our service delivery as we launched eight customers in December. We have never been better positioned to empower businesses with the latest connectivity and cloud platform mobility solutions.

175.     That same day, on February 14, 2019, Iroquois Capital Management, LLC, which previously had owned over 3.57 million shares of Company stock, announced that it had liquidated all of its Pareteum holdings. Upon this news, the price of the Company's stock increased from $3.19 per share at the close of trading on February 14, 2019, to $3.73 per share at the close of trading on February 15, 2019.

### *February 15, 2019 Press Release*

176.     On February 15, 2019, the Company issued a press release stating that the Company had entered into twelve new customer agreements, which had the effect of adding another $49 million to the Company's backlog.

177.     The press release also quoted Defendant Turner, who stated the following:

We love our customers, whether they are simply buying more from us or are new customer relationships deriving value from the significant savings and new revenues we help them generate. These new January agreements reinforce how easy it is to do business with [Pareteum] and is yet another step in our mission to connect every person and "every(thing)" through open mobility and applications everywhere.

178.     Additionally, the press release quoted Mumby, who stated the following:

Pareteum is experiencing great success with developers and enterprises for our cloud software solutions[.] . . .With the addition of these new agreements, we're confident we will continue accelerating our growth as the market's first choice for cloud software communications solutions, expanding our ever growing reach, empowering businesses worldwide.

### *February 20, 2019 Press Release*

179.     On February 20, 2019, the Company issued a press release stating that the Company had entered into an additional six customer agreements during January 2019. The press release quoted Defendants Bozzo and Turner as follows:

"We continue to move signed customers from our contract backlog into production and revenue generation mode, delivering immediate value," said Vic Bozzo, Chief Executive Officer of Pareteum.

Pareteum Executive Chairman and Principal Executive Officer Hal Turner comments, "We are rapidly bringing our customers into service production, enabling them to realize their business plans, creating unique mobility and application software solutions. The ability to quickly accomplish all this, without heavy infrastructure or software development cost, keeps our customers coming back for more."

### *February 26, 2019 Press Release*

180.     On February 26, 2019, while the price of the Company's stock was trading approximately 25% higher than it had traded at the time of the iPass, Inc. acquisition, the Company issued a press release announcing that the Company had secured a $50 million senior secured

credit facility with Post Road Group (the "Post Road Credit Facility"). The press release stated the following:

> The credit facility was led by Post Road Group and is a milestone transaction for Pareteum's mission to connect every person and every(thing)™. The credit facility provides financing secured through Pareteum's existing recurring revenue streams from its software as a service platform, as well as its growing intellectual property portfolio. The transaction enables Pareteum to continue to demonstrate its ability to grow revenues on an organic as well as inorganic basis, globally.

> Approximately $11 million of the initial draw will be used to repay the debt from Fortress Credit Corp. assumed in the iPass transaction. Remaining terms of the transaction are disclosed in Pareteum's regulatory filings.

181.    The press release also quoted Defendant Turner, who stated the following:

> During 2018, we showed our ability to convert our contractual revenue backlog into tangible results. This financing gives us a new currency with which to support our aggressive market consolidation through accretive acquisitions and organic growth strategy and improves leverage in the business to respect the value that management places on equity. The facility will allow us to continue on our current growth trajectory in 2019 and the future

182.    Additionally, the press release quoted Michael Bogdan of Post Road Group, who stated the following:

> We are excited to become Pareteum's capital partners during its next phase of growth and development. The strength of Pareteum's combined capabilities after its recent acquisitions creates a company with significant scale and international presence to drive further consolidation in this industry.

183.    Despite these optimistic representations on the part of the Company and its partners in Post Road Group, from the moment the Post Road Credit Facility was signed, the Company was in default on the terms of the agreement, and within a month the Company would no longer make interest payments or deliver certain third party consents required for the Company to continue receiving loans under the terms of the Post Road Credit Facility.

***February 28, 2019 Press Release***

184.    On February 28, 2019, the Company issued a press release stating that Defendant McCarthy would be attending the Roth Capital 31st Annual Growth Conference on March 19, 2019. The press release stated the following:

> The conference will feature presentations from public and private companies across a variety of industry sectors. Denis McCarthy, Pareteum President, will be available for one-on-one meetings on Tuesday, March 19, to discuss Pareteum's winning strategies for cloud communication software that are driving the growth of the company by harnessing the value of communications.

### March 5, 2019 Press Release

185.    On March 5, 2019, the Company issued a press release stating that the Company had entered into twenty new three-year contracts with customers, which had the effect of adding another $30 million to the Company's backlog.

186.    The press release also quoted Defendant Turner, who stated the following:

> These new customers have chosen Pareteum because we solve real problems and add immediate value to their operations. This is our "Power of ONE TEUM" – by bringing together Pareteum, Artilium, and iPass, we are delivering innovative, easy to use products and services that are the leading edge of this industry. This is how we "reimagine communications" everyday. It is our customers, who have been with us for years and continue to buy more services from us, coupled with our newest relationships, who have benefited most from TEUM's growing market momentum and have contributed to our ever expanding service reputation for quality and dependability.

187.    Additionally, the press release quoted Defendant Bozzo, who stated the following:

> Our plan to establish Pareteum as the leader in communications services is progressing well. We are very pleased with the traction over the last month and the growing list of customers who are choosing to partner with Pareteum to deliver innovative communications services.

### March 7, 2019 Letter to Shareholders

188.    On March 7, 2019, the Company published a letter to shareholders from Defendant Turner on its website, which stated the following:

> Dear Fellow Shareholders,

In September 2018 I wrote a THANK YOU to you for your demonstrable support of Pareteum as you approved the Artilium acquisition. At that time, it was clear that you provided your support to us which in turn affirmed ***our clear mandate to hyper-accelerate growth in accretive ways, be it through our continued stellar sales growth, or, through additional successful strategic alliances*** which is how we began our Artilium acquisition. ***We certainly expect to continue our market disruption, using our software to fuel our ambitions, business plans and strategies***.

* * *

Looking forward, we are a company with ambitious plans for continued growth and profitability. On our upcoming earnings call, scheduled for March 12, 2019, you will hear about our 2018 successes that have laid a strong foundation as we set even more challenging 2019 goals. Our growth will continue from our current customers who continue to buy more from us. We will also see many new customers enter our client rosters, and because of our iPass acquisition, we have opened completely new market segments in the enterprise sector. ***We fully expect to be the market leader in cloud based communications software as a service, as we execute on our business plan***.

* * *

We have been updating you on our progress through our recent press releases, which we will continue to do. As we maintain our laser focus on growth, we measure ourselves by new customers joining us (36MCRB), service deployment (conversion of our 36MCRB), growth from our customer base with new product and services adoption, and clearly taking maximum advantage of our ability to make all of our services available to every customer, no matter if they were an iPass, Artilium, or Pareteum customer …now it is a One TEUM customer base. We expect material productivity enhancement to continue as we use our own software to scale our business. We consider internal communications with our TEUMATES, and with you as shareholders, to be a cornerstone of organization effectiveness.

***We are well positioned now to drive dramatic increases in our scale and become the recognized market leader through the value we create for our customers and shareholders***. We expect to continue to attract long-term institutional investors who believe in our proven ability to execute our plans and scale the company. Additionally, you will have read that we have improved our capital gain plans by the addition of a $50 million debt facility, initially being used to fully repay iPass' approximately $11 million debt on better terms, and ***which puts us in a position to act immediately when accretive opportunities, that further improve Pareteum, are identified. We also believe that leveraging our business in this way demonstrates management's confidence in our business and equity value***.

As you have heard me say many times, ***"we are all in sales!" We are driving hard, everyday to acquire new customers, upsell our existing customers and aggressively convert our 36MCRB***.

(Emphasis added).

### *March 12, 2019 Form 8-K*

189.    On March 12, 2019, the Company filed a current report on Form 8-K with the SEC (the "March 2019 8-K), which contained a press release disclosing Pareteum's financial results for the fiscal quarter and year ended December 31, 2018. Importantly, for the fiscal year ended December 31, 2018, the March 2019 8-K reported that backlog had quadrupled to $615 million, up from $147 million for the fiscal year ended December 31, 2017. The March 2019 8-K stated the following:

**FOURTH QUARTER 2018 FINANCIAL RESULTS:**

**(Unless otherwise noted, all comparisons are made to the fourth quarter of 2017)**

- Total revenues increased 256% to $14.3 million
- In December of 2018 our Global Software Defined Cloud (GSDC) revenue was 51% of our total revenue, with 35% in Managed Services (MSP) revenues, and Super API of 14%
- Adjusted EBITDA increased 82% to $2.34 million
- Non-GAAP EPS of $0.02 cents
- Artilium financials are fully consolidated and accretive in Pareteum's fourth quarter results
- Net Dollar-based expansion rate represented 214% growth

**FULL YEAR 2018 FINANCIAL RESULTS:**

**(Unless otherwise noted, all comparisons are made to full year of 2017)**

- Revenues increased 139% to $32.4 million
- Adjusted EBITDA improved 199% year-over-year to $6.4 million
- Non-GAAP EPS of $0.09 cents compared to $0.05 cents for year ending 2017
- We ended the year with a $6.1 million cash balance and no secured debt

**KEY 2018 OPERATIONAL METRICS:**

- 36-month Contractual Revenue Backlog quadrupled to $615 million for the full year 2018, up from $147 million in 2017 with a conversion rate to revenue of 100%
- Connections increased 252% to 4,609,000 for the full year 2018, and grew 59% sequentially in the fourth quarter of 2018
- Fourth quarter average annualized revenue per employee of $415,000, an improvement of 78% year-over-year

* * *

**RECENT BUSINESS HIGHLIGHTS:**

- The Company completed the acquisition of Artilium in late September bringing several strategic advantages including an increased product offering; larger addressable market in Europe; expanded our executive, operational and sales talent; and enhanced our cloud platform with key operating support systems (OSS) and the internet of things (IOT) capabilities
- In February 2019, Pareteum completed the acquisition of iPass, delivering key strategic benefits including an intelligent Wi-Fi connectivity platform; deep relationships with marquis enterprise customers; strong process, procedures and systems; and strong talent particularly on the technology development side
- The Company closed a $50M credit facility with Post Road Group in February 2019. An initial draw of $25M will be used to repay the debt and transaction costs associated with the iPass transaction and to facilitate accelerated organic growth and potential M&A transactions

**2019 FULL YEAR GUIDANCE:**

We expect revenue to be between $105 million and $115 million for the full year of 2019. Adjusted EBITDA and Cash Flow, net of restructuring and acquisition costs will be positive for the year.

We are expecting 2019 revenue growth in the range of 225% to 260% year-over-year, outpacing the market growth rate fivefold to be updated quarterly.

(Emphasis in original).

190.    The March 2019 8-K also quoted Defendant Turner as follows:

"2018 was a record year for Pareteum, achieving over 139% year-over-year revenue growth driven by the effectiveness of our cloud-based platform, innovative product solutions, employee talent and leading customers. In fourth quarter of 2018, we reported 256% year-over-year revenue growth, which included the first full quarter of our accretive Artilium acquisition," commented Hal Turner, Pareteum's Founder, Executive Chairman and Principal Executive Officer, "We are extremely pleased with Pareteum's significant results in 2018 which are attributed to our

TEUM's laser focus on sales expansion and operational improvements. Looking ahead to 2019, we are very excited about the tremendous opportunities for Pareteum given the strong industry dynamics; our visibility into future revenue from our 36 Month Contractual Revenue Backlog; and, the augmented talent, product, services, network expansion and productivity improvements implicit from our strategic acquisitions."

***March 12, 2019 Conference Call***

191.    That same day, on March 12, 2019, the Company also held a conference call with investors and analysts, during which Defendants Turner and McCarthy discussed the Company's earnings for the fiscal quarter and year ended December 31, 2018.

192.    During the call, Defendant Turner stated, in relevant part:

Pareteum delivered excellent results in 2018 as well as in the fourth quarter of 2018. Pareteum's prospects are now the very best, more than ever before in our history. There is a clear path ahead for dramatic revenue growth and this is fueled by the growth of our 36 Month Contractual Revenue Backlog and its conversion of that backlog into billing customers. Artilium, which we acquired in October of 2018, has performed extraordinarily well. Bart, I want to thank you and all of our new Artilium teammates for that. Artilium was accretive to earnings and revenue just as we said that it would be. Well done, Bart and team.

Since our acquisition of iPass closed just a few weeks ago, many good things have happened. We've got newly -- new high experienced teammates joining with their extremely solid business acumen, their operating muscle, and importantly, we see that our new teammates are highly energized by the significantly expanded prospects that come with their being part of Pareteum.

* * *

For the remainder of 2019, we have a current robust pipeline of another 29 prospective sales transactions, and that's what's been identified just through mid-March. Pareteum's potential addition to our 36-month contractual revenue from these identified customers in our pipeline is currently $166 million.

193.    Notably, during the call, Defendant Turner pointed out that Defendant McCarthy maintained the Company's backlog spreadsheets, stating, "Denis maintains our 36-month contractual revenue backlog spreadsheets and analysis. So I'll turn to him for more detail on that. Denis?"

194.    During the call, Defendant McCarthy stated, in relevant part:

We generated $14.3 million of revenue in the fourth quarter and our gross margins were 63%, in line with expectations post the Artilium acquisition.

\* \* \*

Our key performance indicators continue to exceed plans. Connections, which is our term for subscribers, devices and their connectivity usage, have grown over 4point -- to over 4.6 million at the end of the fourth quarter. 36 Month Contractual Revenue Backlog converted into live production incremental monthly revenue was at 97% of scheduled conversion for the fourth quarter while we're maintaining an average over 100% for the year.

\* \* \*

Finally, as we mentioned during our last call, we are decidedly a growth company. . . .

### March 15, 2019 Press Release

195.    On March 15, 2019, the Company issued a press release stating that the Company had entered into ten new three-year contracts with customers, which had the effect of adding $17 million to the Company's backlog.

196.    The press release also quoted Defendant Turner, who stated the following:

These new customer wins reflect our deep understanding of the challenges faced by a diverse range of dynamic, market-leading organizations, and the great response our solutions represent to those challenges. Our momentum continues to grow in the wake of our acquisitions of Artilium and iPass, and our One TEUM strategy is delivering rich rewards.

197.    Additionally, the press release quoted Mumby, who stated the following:

We are seeing a fantastic response to our enhanced and expanded offering across all sectors. I am confident we will continue to gain traction with our market-leading cloud services as we move towards the next quarter.

### March 18, 2019 Form 10-K

198.    On March 18, 2019, the Company filed the 2018 10-K. The 2018 10-K was signed by Defendants Turner, O'Donnell, Bozzo, Jimenez-Tuñon, Lippert, and van Sante, and contained

SOX certifications signed by Defendants Turner and O'Donnell attesting to the accuracy of the 2018 10-K.

199.    The 2018 10-K reaffirmed the financial results disclosed in the March 2019 8-K, and stated the following with respect to the Company's policies on revenue recognition:

> For the mobile solutions services the Company recognizes revenues from customers accessing our cloud-based application suite in two different service offerings, namely managed services and bundled services.
>
> For managed services, revenues are recognized for network administration services provided to end users on behalf of Mobile Network Operators (MNO) and virtual Mobile Network Operators (MVNO's). Managed service revenues are recognized monthly based on an average number of end-users managed and calculated on a pre-determined service fee per user. For bundled services, the Company provides both network administration as well as mobile airtime management services. Revenues for bundled services are recognized monthly based on an average number of end-users managed and mobile air time and calculated based on a pre-determined service fee. Technical services that meet the criteria to be separated as a separate unit of accounting are recognized as the services are performed. Otherwise they are deferred and recognized over the contract term. Our arrangements with customers do not provide the customer with the right to take possession of the software supporting the cloud-based application service at any time.
>
> Telecommunication revenues were recognized when delivery occurred based on a pre-determined rate and number of user minutes and number of calls that the Company has managed in a given month.
>
> Professional services and other revenue include fees from consultation services to support the business process mapping, configuration, data migration, integration and training. Amounts that have been invoiced are recorded in accounts receivable and in net billings in excess of revenues or revenue, depending on whether the revenue recognition criteria have been met. Revenue for professional and consulting services in connection with an implementation or implantation of a new customer that is deemed not to have stand-alone value is recognized over the contractual period commencing when the subscription service is made available to the customer. Revenue from other professional services that provide added value such as new features or enhancements to the platform that are deemed to have standalone value to the customer or are sold separately from the original hosting arrangement, are deferred and revenue recognition occurs when the feature is activated.
>
> The Company used revenue recognition standards for ASC 605 for the year ended December 31, 2017 and adopted the revenue recognition standards for ASC 606

beginning on January 1, 2018 using the modified retrospective transition method and applied these standards for the full year ended December 31, 2018.

200.    In a section titled, "Controls and Procedures," the 2018 10-K identified certain

deficiencies in the Company's internal controls over its financial reporting, stating:

> Based on the foregoing evaluation, our management has identified the following deficiencies that constitute material weaknesses in the Company's internal controls over financial reporting:
>
> Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the documentation of internal control assessment.
>
> Ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process.
>
> The material weakness did not result in any identified misstatements to the financial statements, and there were no changes to previously released financial results. Based on these material weaknesses, the Company's management concluded that at December 31, 2018, the Company's internal control over financial reporting was not effective.

201.    The 2018 10-K contained an adverse audit report issued by Squar Milner LLP, the

Company's independent accounting firm, which commented on the Company's internal controls

as follows:

> We have audited Pareteum Corporation's and its subsidiaries (the Company) internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013. In our opinion, because of the effect of the material weaknesses  described below on the achievement of the objectives of the control   criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013 ("COSO").
>
> * * *
>
> A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following deficiencies in

internal control have been identified as material weaknesses over the Company's control environment and monitoring pursuant to the COSO framework:

Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the documentation of internal control assessment and ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process.

These material weaknesses were considered in determining the nature, timing and extent of audit tests applied in our audit of the 2018 financial statements, and this report does not affect our report dated March 18, 2019.

* * *

We conducted our audit in accordance with the standards of the PCAOB. . . .We believe that our audit provides a reasonable basis for our opinion.

* * *

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

202.    Despite the Company's admission of a material weakness in its internal controls, the 2018 10-K denied that there had been any changes in the Company's internal controls, stating, "[t]here have been no changes in our internal control over financial reporting during the quarter ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

203.    The 2018 10-K further purported that the Company had already begun taking measures to address the identified deficiencies in the Company's internal controls, stating the following:

The remediation actions to the Company's internal controls over financial reporting include a thorough review and documentation of all processes involved in our financial reporting to ensure that there is segregation of duties, access security and documented review processes in place that happen at appropriate intervals throughout the year that covers all elements of the Company's financial reporting.

This includes, but is not limited to, testing samples and documenting that testing has occurred with the results of the findings being reported to senior management and that they occur at appropriate intervals and continuously making improvements to our processes as necessary.

* * *

We believe that these actions will remediate the material weakness. The weakness will not be considered remediated, however, until the applicable controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively. We expect that the remediation of this material weakness will be completed prior to the end of fiscal 2019.

204.    Notably, the 2018 10-K included an extensive, nearly ten-page long list of risk factors facing the Company, which failed to include any potential risks emanating from the Company's admitted failure to maintain adequate internal controls.

205.    Moreover, one of the 2018 10-K's risk disclosures concerned the Post Road Credit Facility the Company had secured on February 26, 2019, and stated the following:

We have outstanding debt secured by all of the assets of the Company, including our intellectual property, and failure by us to fulfill our obligations under the applicable loan transaction agreements may cause the repayment obligations to accelerate.

In February 2019, we, and certain of our subsidiaries, entered into a credit agreement (the "Credit Agreement") with Post Road Administrative Finance, LLC and its affiliate Post Road Special Opportunity Fund I LLP (collectively, "Post Road"), pursuant to which Post Road will provide the Company with a secured loan of up to $50,000,000 (the "Loan") with an initial loan of $25,000,000 funded on February 26, 2019, and additional loans in increments of $5,000,000 as requested by the Company before the 18 month anniversary of the initial funding date: ***provided however that no additional loans shall be funded until the later of delivery of certain third party consents (the "Consents")***. The Credit Agreement provides for all amounts due on February 26, 2022 and requires us to meet and maintain within specified levels and thresholds with respect to financial and operational covenants, including: requirements to maintain a minimum of $2,000,000 of unrestricted cash, certain maximum total leverage rations, a debt-to-asset ratio, maximum churn rate and adjusted EBITDA. The Credit Agreement further provides customary events of default and cure periods for certain specified events of default, and in the event of uncured default, the acceleration of the maturity date, an increase in the applicable interest rate with respect to amounts outstanding under the Loan and payment of additional fees. The Credit Agreement also provides for an increase in the interest rate upon failure to timely deliver

Consents by May 31, 2019 or July 31, 2019, as applicable. ***There can be no assurance that we will be able to perform and timely repay the amounts outstanding under the Credit Agreement, and upon the occurrence of an event of default under the Credit Agreement, if we are not able to repay all outstanding amounts required, we would lose control over our assets, including our intellectual property, which would seriously harm our business and operations.***

(Emphasis added).

206.     The risk disclosure made in the 2018 10-K concerning the Post Road Credit Facility was false and misleading, because it failed to disclose that: (1) the Company had already failed to perform and timely repay the amounts due to Post Road Group; (2) the Company had been unable to deliver the third party consents required under its agreement with Post Road Group to receive additional loans subsequent to the initial loan of $25 million; and (3) the Company was already in breach of its agreement with Post Road Group by failing to timely provide financial reports to Post Road Group.

### March 28, 2019 Press Release

207.     On March 28, 2019, the Company issued a press release stating that the Company had entered into a $50 million contract with Streaming Media Brand. The press release stated the following:

> [The Company] today announced that its solution has been selected to power the international expansion of one of the Middle East and Africa region's leading digital services brands.
>
> * * *
>
> The initial phase of the contract is valued in excess of $50 million, which is incremental to Pareteum's 36-month contractual revenue backlog. Platform charges will be billed on a monthly per subscriber basis, and subscriber network usage, including Wi-Fi, billed on a prepay basis.

208.     The press release also quoted Defendant Turner, who stated the following:

> This latest partnership provides another great example of how Pareteum empowers brands to interact with customers to deliver targeted, locally relevant services and experiences, on a global basis. With our Global Smart Network, and Global

Software Experience Platform, our brand partners can provide rich digital services from anywhere, to anywhere. Geographical boundaries no longer matter.

209.    Additionally, the press release quoted Defendant Bozzo, who stated the following:

This is a showcase significant strategic win for Pareteum which further proves the value of our recent acquisitions in driving cross- and up-sell opportunities within our addressable markets and rapidly growing customer base.

### April 4, 2019 Press Release

210.    On April 4, 2019, the Company issued a press release stating that the Company had obtained $100 million in new sales agreements in March 2019. The press release stated the following:

[The Company] today announced that new contracts closed during the second half of March 2019 contributed in excess of $80 million to the company's expanding 36-month contractual revenue backlog (36MCRB.

Showcase contracts announced during the second half of March — with a digital services provider based in the Middle East and Africa Region, and a digital currency-based connectivity provider in the US — powered a record $100 million month for Pareteum in newly signed 36MCRB agreements.

211.    The press release also quoted Defendant Turner, who stated the following:

We have developed, built, and delivered software services for a wide range of customers and we are rapidly moving into new markets and territories with 'communications reimagined' services. This record performance, our very first $100 million new 36MCRB sales month, reflects the strong value customers derive as they continue to buy our services. All Pareteum TEUMATES have had a hand in the performance and I congratulate each of our colleagues.

212.    Additionally, the press release quoted Mumby, who stated the following:

We continue to win great new customers while positioning ourselves to become increasingly strategic to existing customers with our highly flexible cloud communications services.

### May 7, 2019 Conference Call

213.    On May 7, 2019, the Company held a conference call with investors and analysts, during which Defendants Turner and McCarthy discussed the Company's earnings for the fiscal quarter ended March 31, 2018.

214.    During the call, Defendant Turner stated, in relevant part:

Now to our business at hand. ***Pareteum is performing extremely well***. Without taking too much of Denis's thunder from his results review coming shortly. ***We reported a 460% Q1 2019 over Q1 2018 revenue increase***, more from Denis on that shortly. ***However we are on target with our products delivered, those being developed, our markets served and those that we will expand to***. Our customers who are onboarding now even more efficiently and our people, matching the very best resources to address every opportunity we have. In every sense, this Company has reimagined the future of communications and we're delivering on it today.

Our mission of connecting every person and everything is also on track. We're on plan financially and we're well above our expectations and sales results. We're raising the quality of customer experiences everyday and we're raising our results and performance expectations with operational transparency. ***As a growth Company, we're expanding in a financially responsible manner.***

215.    With respect to the Company's backlog, Defendant Turner stated the following:

To complete the 36-month contract revenue backlog topic, ***the most important phase for Pareteum is to convert these contracts to billable revenues***. This means new sales orders placed into live production, based upon their contracted schedules for service, invoices rendered, being billed and revenues collected. Our backlog conversion metrics show this story and we're doing very well in this regard.

I'd like to share a couple of details with you. From the inception of tracking the services deployed during the period of January the 1st, 2017 through March the 31st of 2019, that's a 27-month period, we converted revenues in the backlog as they were scheduled at 101%. ***We converted connections which is our word for subscribers at 122%***. This means that taking each contract and comparing what was contractually scheduled by the customers. In both the revenue and connections, ***we've over retained and outperformed what had been expected***. We're very pleased with this growth performance. But I must tell you we're even more pleased with what I'm about to say to you.

216.    Also during the call, Defendant McCarthy stated, in relevant part:

***We have achieved organic growth of 32% over the prior-quarter from the combined Pareteum and our Artilium business*** . . .

* * *

69

As discussed on our year-end call, we established a new $50 million credit facility with Post Road Group and retired the more expensive debts acquired in the iPass acquisition. ***The facility also provides us with significant available liquidity going forward should we need it.***

***While we currently have no plans for the additional capital to operate our business, it gives us additional security and flexibility.*** I want to reinforce Hal's comments about the remarkable transformation that Pareteum has achieved, along with this rapid growth and transformation, ***we have experienced some challenges including those related to our internal controls, primarily as a result of M&A integration.***

(Emphasis added).

217.    The statements made by Defendant McCarthy during the May 7, 2019 conference call concerning the Post Road Credit Facility were false and misleading, because they failed to disclose that: (1) the Company had already failed to perform and timely repay the amounts due to Post Road Group; (2) the Company had been unable to deliver the third party consents required under its agreement with Post Road Group to receive additional loans subsequent to the initial loan of $25 million; and (3) the Company was already in breach of its agreement with Post Road Group by failing to timely provide financial reports to Post Road Group.

218.    Subsequently, between May 7, 2019 and May 8, 2019, over 16 million shares of the Company's stock were traded, representing unusually heavy volume for the Company.

### *May 9, 2019 Form 8-K*

219.    On May 9, 2019, the Company filed a current report on Form 8-K with the SEC (the "May 2019 8-K), which contained a press release disclosing Pareteum's financial results for the fiscal quarter ended March 31, 2019. The May 2019 8-K reported $23 million in total revenue for the quarter, stating, in relevant part:

**FIRST QUARTER 2019 FINANCIAL RESULTS:**

**(Unless otherwise noted, all comparisons are made to the first quarter of 2018)**

- Total revenues increased 460% to $23 million
- Adjusted EBITDA increased 1,723% to $5.2 million
- Non-GAAP EPS of $0.02 cents
- Artilium financials are fully consolidated and accretive in Pareteum's first quarter results
- Net Dollar-based expansion rate represented 144% growth
- Increase in total assets from $27.2 million at March 31, 2018 to $236.9 million at March 31, 2019
- Cash balance of $10.7 million

**KEY FIRST QUARTER OF 2019 OPERATIONAL METRICS:**

- 36-Month Contractual Revenue Backlog increased to $938 million for the first quarter of 2019, up from $200 million in the first quarter of 2018 with a conversion rate to revenue of 101%
- Connections increased 441% to 12,012,000 for the first quarter of 2019, and grew 161% sequentially in the first quarter of 2019
- First quarter average annualized revenue per employee of $390,000, an increase of 55% year over year

\* \* \*

**2019 FULL YEAR GUIDANCE:**

We expect revenue to be between $115 million and $125 million for the full year of 2019. Adjusted EBITDA and Cash Flow, net of restructuring and acquisition costs will be positive for the year.

We are expecting 2019 revenue growth in the range of 255% to 285% year-over-year, outpacing the market growth rate fivefold to be updated quarterly.

(Emphasis in original).

220.    The May 2019 8-K also quoted Defendant Turner as follows:

"We are very pleased with our strong first quarter results, delivering 460% revenue growth in Q1 2019 compared to Q1 2018. Pareteum's core business, pre-acquisitions, has grown 33% over the prior quarter," commented Hal Turner, Pareteum's Founder, Executive Chairman and Principal Executive Officer. "We are proud of the significant business transformation we have achieved over the past few years. Pareteum is a fast-growing and profitable SaaS and communications service provider. Our software and platform solutions are unique in the market, our global TEUM is executing, we are well positioned to capture the large market opportunity, and we are committed to our mission to *connect every person and every(thing)*™."

221.    Additionally, the May 2019 8-K made note of the Post Road Credit Facility, stating the following:

> The Company closed a $50 million credit facility with Post Road Group in February 2019. An initial draw of $25 million will be used to repay the debt and transaction costs associated with the iPass transaction and to facilitate accelerated organic growth and potential M&A transactions.

### *May 10, 2019 Form 10-Q*

222.    On May 10, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2019 with the SEC (the "May 2019 10-Q"). The May 2019 10-Q was signed by Defendants Turner and O'Donnell, and contained SOX certifications signed by Defendants Turner and O'Donnell attesting to the accuracy of the May 2019 10-Q.

223.    The May 2019 10-Q reaffirmed the financial results contained in the May 2019 8-K, and stated the following with respect to the Company's disclosure controls and procedures:

> As of March 31, 2019, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Principal Executive Officer and Principal Financial and Accounting Officer, of the effectiveness of the design and operation of the   Company's disclosure controls and procedures, as defined in Rule 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934. Based on the evaluation, the Company's Principal Executive Officer and Principal Accounting Officer have concluded that, due a previously reported material weakness in our internal control over financial reporting described below, the Company's disclosure controls and procedures were not effective as March 31, 2019. In light of the material weakness described below, we performed additional analysis and other post-closing procedures to ensure our financial statements are prepared in accordance with generally accepted accounting principles.

224.    The May 2019 10-Q also reported that the Company had addressed the material weaknesses disclosed in the 2018 10-K, stating, in relevant part:

> To address ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process, the Company has (i) removed all live access to all developers, internal and external, from being able to make coding changes directly in our reporting system; (ii) has continued to monitor and document all changes made in our reporting

system and add additional layers of documented review of these changes; (iii) instituted sample testing of changes made in our reporting system to ensure the documented policies are being followed and report the results of these tests to senior management in regular appropriate intervals; and (iv) enhanced our quarterly reporting on the remediation measures to the Audit Committee of the Board of Directors. Management believes this material weakness has been remediated, as of March 31, 2019, pending further testing. .

We also continue to develop certain remediation steps to address the material weakness discussed above to improve our assessment of internal control over financial reporting. As of March 31, 2019, these efforts are ongoing.

We are committed to maintaining a strong internal control environment and believe that these remediation actions will represent significant improvements in our controls. However, the identified material weakness in internal control over financial reporting will not be considered remediated until controls have been designed and/or controls are in operation for a sufficient period of time for our management to conclude that the material weaknesses have been remediated. Additional remediation measures may be required, which may require additional implementation time. We will continue to assess the effectiveness of our remediation efforts in connection with our evaluations of internal control over financial reporting.

225.   The May 2019 10-Q made no updates to the risk factors facing the company

previously outlined in the 2018 10-K, stating the following:

In addition to the other information set forth in this Quarterly Report on Form 10Q, you should carefully consider the Risk Factors included in Part I, Item 1A. "Risk Factors" of our Annual Report on Form 10K for the year ended December 31, 2018, and the Risk Factors included in Part I, Item 1A. – "Risk Factors" of our Quarterly Report on Form 10Q for the period ended September 30, 2018. These Risk Factors could materially impact our business, financial condition and/or operating results. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may materially adversely impact our business, financial condition and/or operating results.

226.   With respect to the Company's compliance with GAAP, the May 2019 10-Q stated

the following:

The interim condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America ("GAAP,") for interim financial information and in accordance with the instructions to Securities and Exchange Commission ("SEC"), Form 10-Q and Article 8 of SEC Regulation SX. They do not include all the information and

footnotes required by GAAP for complete financial statements. Therefore, these financial statements should be read in conjunction with our audited consolidated financial statements and notes thereto for the year ended December 31, 2018, included in our 2018 Annual Report on Form 10K filed with the SEC on March 18, 2019, referred to as our 2018 Annual Report.

The interim condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly our results of operations and financial position for the interim periods. The results of operations for the three months ended March 31, 2019, are not necessarily indicative of the results to be expected for future quarters or the full year. All intercompany transactions and account balances have been eliminated in consolidation. . . .

***May 15, 2019 Press Release***

227. On May 15, 2019, the Company issued a press release stating that the Company had obtained $70 million in connection with more than 20 new sales agreements in April 2019.

228. The press release also quoted Defendant Turner as follows:

"We continue to drive growth through our sales efforts as our addressable markets expand and our cloud-based SaaS products and solutions are able to deliver new requirements in an increasingly connected world," said Hal Turner, Executive Chairman and Principal Executive Officer of Pareteum. "At Pareteum, we believe we are 'all in sales' and we are pleased with another strong monthly performance."

229. Additionally, the press release quoted Mumby, who stated the following:

Each new customer represents an opportunity to build a unique and strategic relationship and facilitates cross-sell and up-sell of our expanding suite of global cloud software capabilities.

***May 28, 2019 Analyst and Investor Day Presentation***

230. On May 28, 2019, the Company held an invite-only analyst and investor day. A press release issued by the Company on May 14, 2019 touted the event, and stated, "Pareteum's management team will provide updates on the Company's vision, new product offerings and growth strategies. The event will also include select Pareteum partners and customers."

231.    At a presentation given during the event, the Company displayed the following slide:



***June 6, 2019 Proxy Statement***

232.    The Company filed the 2019 Proxy Statement with the SEC on June 6, 2019. Defendants Turner, Jimenez-Tuñon, Lippert, and van Sante solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[4]

233.    With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated, "[t]he code of conduct applies to all employees, as well as each member of our Board of Directors. All employees are required to read the code of conduct and affirm in writing their acceptance of the code."

---

[4] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

234.     The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

235.     The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company was unlikely to collect revenue from certain customer transactions; (2) the Company improperly recognized revenue in its financial statements from these customer transactions, in violation of GAAP; (3) as a result, the Company's revenue backlog and accounts receivable were artificially inflated; and (4) the Company would ultimately need to restate each of its financial statements issued during the fiscal year ended December 31, 2018, and for the fiscal quarters ended March 31, 2019 and June 30, 2019. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

236.     The statements referenced above in ¶¶ 100–102, 104–115, 117, 119–121, 123–134, 141–145, 147–164, 166–171, 173–179, 281–202, 204–213, and 216–228 were materially false and misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business, finances, and prospects, which were known to the Individual Defendants or recklessly disregarded by them. Specifically, the Individual Defendants willfully or recklessly made false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was unlikely to collect revenue from certain customer transactions; (2) the Company improperly recognized revenue in its financial statements from these customer transactions, in violation of GAAP; (3) as a result, the Company's revenue backlog and accounts receivable were artificially inflated; and (4) the Company would ultimately need to restate each of its financial statements issued during the fiscal year ended December 31, 2018, and for the fiscal

quarters ended March 31, 2019 and June 30, 2019. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge as False and Misleading Statements Continue

***June 7, 2019 Marcus Aurelius Value Report***

237.    On June 7, 2019, Marcus Aurelius Value published the Marcus Aurelius Report, which discussed certain accounting irregularities in Pareteum's financial statements. The Marcus Aurelius Report commented on the irregularities, and in particular the Company's abnormally large backlog, as follows:

TEUM's Purported $900 Million Backlog Appears Significantly Exaggerated or Fictitious.

The foundation of the Pareteum growth story is built on the company's supposedly large and fast-growing 36-month backlog, which management now says exceeds $900 million. But our investigation identified a variety of purportedly valuable customers that appear wholly incapable of paying TEUM anywhere near the large contractual values that TEUM has touted.  Examples include:

- A nearly-worthless penny-stock managed by a former AudioEye executive named alongside TEUM's CFO in the fraud suit.
- African entities that show no signs of meaningful business activity.
- Contracts with crypto-companies including one that recently settled with the SEC and "agreed to return funds to harmed investors."
- Closed or dissolved businesses.
- Websites that are inactive or offer limited contact information.
- Businesses that don't answer the phones or report having minimal employees.
- European entities with tiny amounts of capital or revenue.
- Featured customers located in apartment buildings.
- Millions in loans to an entity bleeding cash.
- A purported $50 million contract with an entity in Thailand that reports having zero 2018 revenue, years of losses, and involvement with a crypto-coin that has lost 97% of its peak value.

We also found irregularities and embellishments involving a significant portion of the "notable partners and customers" that TEUM highlighted in a graphic at its recent analyst day, suggesting TEUM struggles to find enough legitimate new customers to even fill a simple slide.

<u>TEUM's Backlog Conversion and Receivables Signal Serious Potential Accounting Problems.</u>

The accounting fraud that TEUM's CFO allegedly perpetrated at AudioEye involved the booking of phantom revenues to artificially inflate the stock price. Bulls have taken comfort in management's assurances that TEUM's backlog has converted to revenue at over 100% of contractual rates thus far. But we find TEUM's backlog conversion rate highly problematic considering that our research has flagged so many small or defunct customers. If exaggerated contractual values are now being recognized as revenue, then we believe TEUM will face serious accounting problems. TEUM's receivables have already begun to balloon after growing at sequential rates far faster than revenues in each of the last four quarters. TEUM's small California auditor, which was specifically cited by the PCAOB for audit deficiencies related to revenue, gives us no comfort.

This is exactly why we're troubled that TEUM's receivables have grown at sequential rates far faster than revenues in each of the last four quarters. For example, revenues grew 64% to $23M in Q1 2019 from $14M in Q4 2018 but receivables ballooned 86% to $28M from $15M over the same period. This is puzzling because TEUM's own SEC filings state that "the company typically bills its customers at the end of each month, with payment to be received shortly thereafter", which we believe should naturally result in relatively minimal receivables. But TEUM's Days Sales Outstanding has reached 110 days as compared 39 days of Twilio (TWLO), a company that promoters like to compare TEUM to, suggesting that TEUM's customers may already be falling behind on their bills.

TEUM's small California auditor, Squar Milner, gives us no additional comfort. Squar has audited at least one company owned by Barry Honig, True Drinks Holdings (TRUU), an equity that is now virtually worthless. More importantly, the Public Company Accounting Oversight Board ("PCAOB") uncovered significant deficiencies in its most recent inspection of Squar in 2017. The PCAOB stated in its report that "in other words, in these audits, the auditor [Squar] issued an opinion without satisfying its fundamental obligation to obtain reasonable assurance about whether the financial statements were free of material misstatement." The PCAOB even identified two significant deficiencies in a Squar audit specifically related to the valuation of revenue . . .

238.    The Marcus Aurelius Report documented an investigation into Eyethu Mobile Network, one of Pareteum's purported customers, as follows:

TEUM's public claims simply don't hold up to investigative scrutiny. For example, TEUM touted a contract with the South Africa based "Eyethu Mobile Network" as part of a group of deals, purportedly worth $50 million in aggregate, that TEUM says it signed in the last two weeks of August 2018. . . . Our investigators went to

visit Eyethu/EMN's headquarters but discovered only a dilapidated shack and crumbling structures near a rural African village . . .

Documents and detailed forensic evidence presented throughout this report shows that Eyethu is only the tip of the iceberg of small or defunct entities across the world that TEUM claims to have signed valuable contracts with.

239.    Moreover, the Marcus Aurelius Report detailed numerous ties between the

Company's management, including certain of the Individual Defendants, and various failed stock

promotions and other schemes, stating the following:

<u>TEUM's Management Has Extensive Ties to Previous Alleged Frauds and Failures.</u>

The biographies for Turner and TEUM's COO fail to disclose their leadership positions at Catcher Holdings, a now worthless stock that was owned by a group that included an entity controlled by Barry Honig, the notorious stock operator charged by the SEC last October with fraud for alleged pump and dump schemes. We see similarities between TEUM and the stock promotion at Catcher, where Turner repeatedly touted Catcher's technology and growth prospects but investors ultimately were left with nothing.  TEUM's CFO was sued by investors for fraud after he allegedly "*personally affected the fraudulent booking of revenues*" as CFO of Audioeye, which later erased <u>*92%*</u> of reported revenues over the relevant period in a restatement.  TEUM's former Audit Committee Chair, now a TEUM executive, was the CFO of TowerStream, another Honig-backed company that is now nearly worthless.   TEUM's   longtime   investor   relations   representative   was previously <u>sentenced to prison</u> in 2015 and recently disappeared from press releases after being added to a list of prohibited service providers by OTC markets

\* \* \*

While Chairing TEUM's Audit Committee, Laura Thomas was also the CFO of TowerStream, a nearly worthless equity owned by Honig.  Thomas moved from the TEUM Board to an executive role at TEUM in December 2018 and resigned from TowerStream in January 2018.

TEUM's longtime investor relations representative was Stephan Hart (aka Steven or Stephen Hart) who disappeared from TEUM press releases earlier this year after being added to the list of prohibited service providers by OTC markets. Hart was representing TEUM even though he was sentenced to prison in August 2015 for obstruction of justice and perjury following charges by the SEC for "illegal trading schemes" in December 2012.

\* \* \*

<u>TEUM Has Surrounded Itself with Veterans from Failed Stock Promotions.</u>

We discovered a network of actors behind TEUM whose mere presence should send diligent investors running for hills. TEUM has paid promoters, used a placement agent, and attracted large investors that are veterans of numerous previous stock promotions Honig was an investor in, many of which have since declined to near worthlessness. We discovered that TEUM's relationship with Honig's longtime securities law firm, Sichenzia Ross, is so close that the address that TEUM's lists on its website as its "USA Headquarters" is actually Sichenzia's main office. TEUM has issued tens of millions in shares, warrants, and convertible preferred securities in a series of complex private placements with the assistance of Sichenzia, who is being sued by a former client for allegedly helping create "ownership blockers" for Honig's group as part of an alleged pump and dump scheme that left that company bankrupt and unable to even validate its number of shares outstanding (Sichenzia and Honig deny the allegations)

* * *

TEUM uses the same placement agent as Mabvax [Theraputics]12 did, a Boca Raton broker named Dawson James Securities that also now issues favorable research reports on TEUM. According to our analysis, Dawson James has been engaged by 13 different companies that have been owned by Honig, most of which have declined more than 75% from their peak value and/or are now virtually worthless.

* * *

While we are unable to identify all of TEUM's private placement investors, two firms that have regularly invested alongside Honig, Iroquois Capital and IntraCoastal Capital, owned or controlled 13.2% of TEUM's outstanding shares as of March 2018, according to an SEC filing. By our count, Iroquois and/or Intracoastal have collectively invested in a total of 34 publicly traded companies that were also owned by Honig, most of which have either declined more than 75% from their peak value or are now virtually worthless. A February 2019 SEC filing reported that Iroquois Capital has already dumped their entire TEUM stake. We note that Iroquois reportedly received an SEC subpoena as part of the investigation into Honig's alleged pump and dump ring but was not named in the SEC complaint or been accused of wrongdoing.

TEUM has paid stock promoters from Red Chip companies, which has previously touted numerous now worthless companies backed by Honig. . . .

240.    After the article was released, the price of the Company's stock fell to $2.58 per share at the close of trading on June 7, 2019, down from $3.41 per share at the close of trading on June 6, 2019, representing a loss in value of 24%.

### June 25, 2019 Viceroy Research Group Report

241.   On June 25, 2019, Viceroy Research Group published a report that further analyzed Pareteum's suspicious accounting practices, titled, "Pareteum – the Wild West of Telecoms" (the "Viceroy Report").[5] The Viceroy Report presented the following overview of Viceroy Research Group's findings:

- Further to recent research reports, Pareteum has a history of promotional press releases of customer wins. A deeper investigation into these customers show much larger number are insignificant, and the companies behind them appear in no way capable of fulfilling the contract values advertised by Pareteum.
- Two of Pareteum's customer wins appear to be undisclosed related parties tied to Pareteum consultant Dinesh "Danny" Patel.
- One of Pareteum's announced customer wins is a company under a historic investigation and charged with significant VAT evasion fraud. Information on this is easily available, leading us to believe that Pareteum was aware of the company's issues while announcing the customer win.
- Pareteum appears to be in breach of US sanctions against Iran through its provision of services to Iranian MVNO Amin SMC. Amin SMC appears to be chaired by Hamid Reza Amirinia, an individual suspected of breaching sanctions with an Iranian government mandate to launder money for the regime

* * *

- Several entities on the pareteum.cloud domain are small companies or have no web presence whatsoever, leading us to believe that they are Pareteum customers who are unable to pay or have no operations.
- Pareteum's 36-month contractual backlog measurement is not an accurate predictor of future profits. An analysis of the company's backlog and management comments shows it should have reported 73.10% more revenue in Q1 2019 than it did. Management appears to be inflating this figure to hype up the share price and reassure investors.

* * *

- Pareteum's management has a history of dishonest reporting. Notably, CFO Ted O'Donnell who was sued by former employer AudioEye for fabricating US$8.1m worth of revenue over 3 quarters which was found to have no supporting documentation. This was an overstatement of revenues in the period of more than 3,000%.

---

[5] https://viceroyresearch.files.wordpress.com/2019/06/pareteum-26062019.pdf (last visited October 30, 2019).

- Pareteum's rapid-fire announcement of customer wins mirrors its announcements regarding cryptocurrency in 2017, which were put to an abrupt halt when a response to an SEC letter revealed TEUM had made no revenue, nor planned to do so, from cryptocurrency.

* * *

- A breakdown of Pareteum's revenues, cash flows and receivables show the majority of its revenue from sources other than Vodafone and acquired businesses iPass and Artilium appears to be uncollectable. Accordingly, we believe total revenue is overstated by 42%, corroborating our findings regarding Pareteum's customers.

242.    The Viceroy Report specifically discussed the revenue figures reported in

Pareteum's financial statements as follows:

Pareteum has 4 months accounts receivable sitting on its balance sheet. When combined with the drastic increase in receivable days since the end of 2017, it appears that Pareteum's new customers are not paying their bills. Despite this Pareteum's management continues to recognize this apparent uncollectable revenue from customers.

* * *

- Pareteum's acquired businesses iPass and Artilium are getting paid on "typical" billing terms of 30 days, per management assertion. It is noteworthy that *this is not strictly true*:
  o Artilium's last publicly available financials show **77.473 receivable days** and claim that the average credit period on sales to be **87 days** as of June 30, 2018.
  o iPass's Q3 2018 10-Q revenue and receivables figures show **78.155 receivable days** with standard credit terms of **30 days.**
- iPass' purchase price accounting allocated US$4.344m in accounts receivable to Pareteum's balance sheet.
- Artilium's purchase price accounting allocated a negligible amount of accounts receivable to Pareteum's balance sheet: it appears Pareteum wrote a significant balance off. We have not accounted for this negligible balance.

According to our model Pareteum has collected only 4% of the revenue recognized from these customers in the 12 months trailing Q1 2019. While this figure is probably lower than Pretium's actual collections, it creates a Catch-22 situation where receivables from Artilium and iPass are also growing exponentially.

(Emphasis in original).

243.    The Viceroy Report concluded with the following statements:

At a glance Pareteum's growth story could be described as suspicious. After our investigation we believe this growth story is completely broken and may not have ever existed at all. Investors should take a look at the damage inflicted on Catcher Holdings, Davnet and AudioEye as a sign of things to come if management is investigated or held accountable for its actions.

We advise investors to call for a fully independent investigation of management, in particular: Hal Turner and Ted O'Donnell and for an investigation of the company's revenue recognition practices and internal controls.

244.    Upon the publication of the Viceroy Report, the price of the Company's stock dropped again, from $2.51 at the close of trading on June 25, 2019, to $2.00 at the close of trading on June 26, 2019, on heavy volume.

### *August 6, 2019 Press Release*

245.    On August 6, 2019, the Company issued a press release (the "August 2019 Press Release"), which would subsequently be attached as an exhibit to a current report on Form 8-K the Company filed with the SEC on August 13, 2019. The August 2019 Press Release announced the Company's financial results for the fiscal quarter ended June 30, 2019, which conspicuously failed to include any mention of the Company's previously disclosed backlog. The August 2019 Press Release stated, in relevant part:

**SECOND-QUARTER 2019 FINANCIAL RESULTS YEAR-OVER-YEAR:**

- Total revenue increased 469% to $34.1 million
- Income from Operations totaled $159,000
- EBITDA increased 466% to $3.4 million
- Adjusted EBITDA increased 369% to $6.1 million
- Non-GAAP EPS of $0.03 (Non-GAAP EPS of $0.05 for the 6 months ending June 30, 2019)
- Net Dollar-based expansion rate represented 151% growth
- Increase in total assets from $33.1 million at June 30, 2018 to $246.9 million at June 30, 2019

\* \* \*

**KEY SECOND-QUARTER OPERATIONAL METRICS:**

- Connections increased 380% to 13,030,000 for the second quarter of 2019, and grew 108.5% sequentially for the first half of 2019
- Second-quarter average annualized revenue per employee of $583,000, an increase of 55% year-over-year

***August 9, 2019 Form 10-Q***

246.    On August 9, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2019 with the SEC (the "August 2019 10-Q"). The August 2019 10-Q was signed by Defendants Turner and O'Donnell, and contained SOX certifications signed by Defendants Turner and O'Donnell attesting to the accuracy of the August 2019 10-Q.

247.    The August 2019 10-Q reaffirmed the financial results contained in the August 2019 Press Release, and reported that the Company was continuing to address the material weaknesses disclosed in the 2018 10-K, stating, in relevant part:

> To address ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process, the Company has (i) removed all live access to all developers, internal and external, from being able to make coding changes directly in our reporting system; (ii) has continued to monitor and document all changes made in our reporting system and add additional layers of documented review of these changes; (iii) instituted monitoring controls and sample testing needs to be completed on our reporting system to ensure the documented policies are being followed and report the results of these tests to senior management in regular appropriate intervals; and (iv) enhanced our quarterly reporting on the remediation measures to the Audit Committee of the Board of Directors. Management believes the Company has taken significant steps towards the remediation of the identified material weaknesses, as of June 30, 2019.
>
> We also continue to develop certain remediation steps to address the material weakness discussed above to improve our assessment of internal control over financial reporting. As of June 30, 2019, these efforts are ongoing.
>
> We are committed to maintaining a strong internal control environment and believe that these remediation actions will represent significant improvements in our controls. However, the identified material weakness in internal control over financial reporting will not be considered remediated until controls have been designed and/or controls are in operation for a sufficient period of time for our management to conclude that the material weaknesses have been remediated. Additional remediation measures may be required, which may require additional

implementation time. We will continue to assess the effectiveness of our remediation efforts in connection with our evaluations of internal control over financial reporting.

***August 23, 2019 Form 8-K***

248.    On August 23, 2019, the Company filed a current report on Form 8-K with the SEC, which included as an exhibit a "Waiver and First Amendment to Credit Agreement" (the "Waiver") in connection with the Post Road Credit Facility. The Waiver constituted an agreement between Post Road Group and the Company to waive the Company's default under the Post Road Credit Facility, and stated the following:

> This WAIVER AND FIRST AMENDMENT TO CREDIT AGREEMENT dated as of August 22, 2019 (this "Amendment") is by and among PARETEUM CORPORATION, a Delaware corporation (the "Borrower"), the guarantors party hereto (the "Guarantors" and together with the Borrower, each a "Credit Party" and, collectively, the "Credit Parties"), the lenders party hereto (each a "Lender" and, collectively, the "Lenders"), POST ROAD ADMINISTRATIVE LLC, a Delaware limited liability company ("Post Road"), as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Administrative Agent") and Post Road, as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns in such capacity, the "Collateral Agent", and together with the Administrative Agent, collectively, the "Agents" and each an "Agent"), and relates to that certain Credit Agreement dated as of February 26, 2019, by and among the Borrower, the Credit Parties party thereto, the Lenders party thereto and the Agent (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").
>
> WHEREAS, the Borrower has requested that the Administrative Agent (a) waive the breaches of certain obligations and covenants under the Credit Agreement as set forth in greater detail on Annex A attached hereto for the periods specified therein, as applicable (collectively, the "Subject Obligations and Covenants" and (b) amend the Credit Agreement as set forth herein; and
>
> WHEREAS, the Administrative Agent is willing to acquiesce to the Borrower's request, subject to the terms and conditions outlined in this Amendment.

249.    The Waiver also revealed the Company's obligations under the Post Road Credit Facility, which the Company had failed to satisfy, as follows:

1. To comply with the requirements set forth in the definition of "Permitted Acquisition" in connection with the consummation of the DeviceScape Acquisition as required by clause (m) of Section 9.05 of the Credit Agreement.

2. To timely make the interest payment owed to the Administrative Agent for the Period that ended on or about March 31, 2019, as required by Section 2.09(b) of the Credit Agreement.

3. To timely deliver (i) the financial reporting information for the fiscal month ending February 28, 2019 as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

4. To timely deliver (i) the financial reporting information for the fiscal month ending March 31, 2019 as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

5. To timely deliver (i) the financial reporting information for the fiscal quarter ending March 31, 2019 as required by Section 8.01(b) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

6. To timely deliver (i) the financial reporting information for the fiscal month ending April 30, 2019 as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

7. To timely deliver (i) the financial reporting information for the fiscal month ending May 31, 2019 as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

8. To timely deliver (i) the financial reporting information for the fiscal month ending June 30, 2019 as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

9. To timely deliver the [***] Consent and Acknowledgment as required by Section 8.17 of the Credit Agreement.

10. To timely deliver the [***] Consent and Acknowledgment as required by Section 8.17 of the Credit Agreement.

11. To comply with Sections 8.10 and 8.11 of the Credit Agreement in connection with the formation of its wholly-owned subsidiary DeviceScape Holdings, Inc., a Delaware corporation, and its acquisition of certain assets from DeviceScape Software, Inc., a California corporation, on or about April 22, 2019.

250.     In order to obtain the waiver the Company sought, as well as a final loan in the amount of $2.5 million from Post Road Group, the Company agreed to issue 750,000 shares of Company stock to Post Road Group on August 22, 2019, as well as an additional 250,000 shares to be issued to Post Road Group on November 15, 2019, which had the effect of diluting existing shares of Company stock.

251.     On this news, the price of the Company's stock to drop from $2.76 per share at the close of trading on August 23, 2019, to $2.47 per share at the close of trading on August 26, 2019, representing a 10.5% decline in value.

***August 27, 2019 Seeking Alpha Report***

252.     On August 27, 2019, Seeking Alpha published a report titled, "Pareteum – Caught in a Cash Crunch After Violating Debt Covenants."[6] The report commented on the Post Road Credit Facility, as well as the Company's revenue generally, stating, in relevant part:

> Shares of controversial emerging Communications Platform as a Service ("CPaaS") provider Pareteum Corporation have remained under pressure in recent weeks after the company's Q2/2019 results on August 6 revealed two major issues:
>
> 1. ***Accounts receivable ballooned an eye-catching 57% quarter-over-quarter***, even outpacing the 48% sequential revenue increase. ***Over the past six months, accounts receivable have almost tripled from $15.4 million at year end 2018 to $45.1 million at the end of Q2.***
> 2. Free cash flow for the quarter was negative $8 million, leaving the company with just $3.4 million in unrestricted cash at the end of Q2, ***dangerously close to the $2 million minimum liquidity covenant defined in its up to $50 million senior secured credit facility with Post Road Group***, a Connecticut-based junior private investment firm. For the first half of FY2019, Pareteum used $16.7 million in operating and investing activities.
>
> On the conference call, ***management actually pointed to accounts receivable to increase even further during Q3 with collections starting to come through in Q4.***

---

[6]   https://seekingalpha.com/article/4288112-pareteum-caught-cash-crunch-violating-debt-covenants   (last   visited October 29, 2019).

(Emphasis added).

253.    The report also cautioned investors about the Company's financial stability, and predicted that the Company would likely need to implement a secondary offering at some point in the future in order to remain solvent, stating the following:

> Personally, I do neither expect the company to return to covenant compliance in due time nor the accounts receivable issue starting to resolve itself by next quarter. ***Accordingly, investors might have to prepare for a large, secondary offering in the not too distant future.***
>
> Should the company not start to collect on its accounts receivable in due time, ***Pareteum will likely lose its ability to access the capital markets with bankruptcy being the ultimate outcome in this case.***
>
> ***Given the recent, negative developments and the company's increasingly uncertain outlook, investors should continue to avoid the shares or sell existing positions***.
>
> * * *
>
> At this point, the company might still be able to sell additional equity but given the requirement to raise at least $35-$40 million to repay the [C]redit [F]acility including considerable exit fees and bridge the gap to anticipated cash collections in Q4 would likely cause the stock to tumble well below the $2 mark, particularly if investors require Pareteum to issue warrant sweeteners or even enter into a toxic financing transaction.
>
> ***Frankly speaking, things are really starting to look ugly for Pareteum***. ***The company has been in breach of debt covenants basically right from the closing date of the credit agreement with Post Road Group in February and seems now caught in a severe cash crunch.***
>
> * * *
>
> As of this point, it seems that the skeptics have been right on Pareteum as the company is obviously experiencing a cash crunch with the lender only reluctantly providing additional liquidity to keep the company afloat for now.
>
> Should Pareteum again fail to comply with the covenants and obligations under the amended credit agreement, ***Post Road Group might very well chose to issue a notice of default, requiring the company to repay the almost $28 million currently outstanding under the facility within short notice.***

(Emphasis added).

***September 20, 2019 Press Release***

254.    On September 20, 2019, the Company issued a press release announcing a highly dilutive secondary offering of 18.8 million shares of the Company's common stock, and 3.8 million units of warrants to purchase shares of the Company's stock, priced at $40 million.

255.    On this news, the price of the Company's stock fell from $1.84 per share at the close of trading on September 19, 2019, to $1.67 per share at the close of trading on September 20, 2019, representing a 9.2% decline in value.

***October 15, 2019 Form 8-K***

256.    On October 15, 2019, the Company filed a current report on Form 8-K with the SEC (the "October 15, 2019 8-K"), which revealed that on October 9, 2019, Defendant McCarthy's employment with the Company had been terminated. As COO of the Company, Defendant McCarthy had been responsible for, among other things, maintaining the Company's revenue backlog spreadsheets. The October 15, 2019 8-K stated, in relevant part:

> On October 9, 2019, Denis McCarthy and Pareteum Corporation (the "Company") entered into a settlement agreement and release (the "Separation Agreement") pursuant to which Mr. McCarthy's at-will employment agreement with the Company was terminated and Mr. McCarthy ceased all positions with the Company and its subsidiaries, including as the Company's Chief Operating Officer. Pursuant to the Separation Agreement, Mr. McCarthy will receive a severance payment of $225,000 to be paid in equal monthly installments according to the Company's payroll practices over a period of 12 months from the date of the Separation Agreement and agreed not to trade in the Company's securities through October 1, 2021. Mr. McCarthy will also forego earned and unearned bonuses and vested and unvested stock options will lapse.

257.    Upon this disclosure, the price of the Company's stock fell over the course of several trading days from $1.19 at the close of trading on October 14, 2019, to $0.83 per share at the close of trading on October 17, 2019, a decline of 30.2% on heavy volume.

258.    The statements referenced above in ¶¶ 242–246 were materially false and misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business, finances, and prospects, which were known to the Individual Defendants or recklessly disregarded by them. Specifically, the Individual Defendants willfully or recklessly made false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was unlikely to collect revenue from certain customer transactions, in violation of GAAP; (2) the Company improperly recognized revenue in its financial statements from these customer transactions; (3) as a result, the Company's revenue backlog and accounts receivable were artificially inflated; and (4) the Company would ultimately need to restate each of its financial statements issued during the fiscal year ended December 31, 2018, and for the fiscal quarters ended March 31, 2019 and June 30, 2019. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

259.    Finally, on October 21, 2019, the Company filed another current report on Form 8-K with the SEC (the "October 21, 2019 8-K"), which disclosed to the investing public that the financial statements included in the 2018 10-K, the May 2019 10-Q, and the August 2019 10-Q "should no longer be relied on," and consequently would need to be restated. The October 21, 2019 8-K stated the following:

> On October 21, 2019, the board of directors of Pareteum Corporation (the "Company") determined that the Company's financial statements which were included in its annual report for the year ended December 31, 2018 and quarterly reports for the quarters ended March 31, 2019 and June 30, 2019 (collectively, the "Non-Reliance Periods") should no longer be relied upon. Similarly, related press releases, earnings releases, and investor communications describing the Company's financial statements for the Non-Reliance Periods should no longer be relied upon. The Company will restate financial statements for the Non-Reliance Periods in advance of filing the Company's Quarterly Report on Form 10-Q for the three months ended September 30, 2019.

The decision to restate these financial statements is based on the Company's conclusion that certain revenues recognized during 2018 and 2019 should not have been recorded, during that period. For certain customer transactions, the company may have prematurely or inaccurately recognized revenue. These restatements should not impact historical cash or cash equivalents based upon the current review. At the present time, the restatements are expected to impact Revenue, Cost of Service, Operating Income, Net Loss, Accounts Receivable and other Balance Sheet line items. While the Company's analysis is still underway, ***the Company currently estimates the revenue impact for the full year 2018 to be a reduction of approximately $9 million. For the first half of 2019, the Company currently estimates the revenue impact to be a reduction of approximately $24 million.***

At this time, the Company has not fully completed its review and the expected financial impact of the restatement described above is preliminary and subject to change. The Company cannot predict the aggregate amount of revenue that will ultimately be restated, whether additional periods beyond those referenced above will be affected, and the final outcome or timing of the Company's filing of restated financial statements for the affected annual and quarterly periods. ***Until the full magnitude of these transactions is analyzed and understood, the company cannot provide forward guidance, and we expect the second half and full year 2019 will be materially below current analysts' estimates***.

260.    On this news, the price of the Company's stock dropped yet again, from $0.74 per share at the close of trading on October 21, 2019, to $0.30 per share at the close of trading on October 22, 2019, representing a loss in value of nearly 60%.

261.    On November 5, the Company issued a press release revealing that on November 1, Defendant O'Donnell had been replaced as CFO by Defendant Thomas, who will serve as interim CFO. The press release further stated that Defendant O'Donnell's status with the Company is under review.

262.    On November 13, 2019, NASDAQ officials informed the Company that because the Company had not yet filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2019, the Company was no longer in compliance with the NASDAQ Listing Rules. As such, if the Company does not submit to NASDAQ a plan for regaining compliance with the

NASDAQ Listing Rules within 60 calendar days of November 13, 2019, or if NASDAQ does not accept the plan the Company submits, the Company may be delisted from NASDAQ.

263.    On November 25, 2019, the Company issued a press release disclosing that on November 22, 2019, Defendant Turner had been terminated from his positions as Executive Chairman and CEO.

264.    This significant shakeup of the Company's management, along with the risk of potential NASDAQ delisting that the Company now faces, further underscore the gravity of the Individual Defendants' misconduct.

## DAMAGES TO PARETEUM

265.    As a direct and proximate result of the Individual Defendants' conduct, Pareteum will lose and expend many millions of dollars.

266.    Such losses include, but are not limited to, the 1,000,000 shares of Company stock issued to Post Road Group on August 22, 2019 and November 15, 2019 arising out of the Company's failure to satisfy its obligations under the Post Road Credit Facility, as well as the September 20, 2019 public offering of 18.8 million shares of Company stock and 3.8 million purchase warrants. Each of these offerings had the effect of seriously diluting existing Company shareholders.

267.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its former CEO, its CFO, its CCO, and its former COO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

268.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

269.    As a direct and proximate result of the Individual Defendants' conduct, Pareteum has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

270.    Plaintiff brings this action derivatively and for the benefit of Pareteum to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Pareteum, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

271.    Pareteum is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

272.    Plaintiff is, and has been at all relevant times, a shareholder of Pareteum. Plaintiff will adequately and fairly represent the interests of Pareteum in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

273.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

274.    A pre-suit demand on the Board of Pareteum is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following four individuals: Defendants Jimenez-Tuñon, Lippert, and van Sante (the "Director-Defendants"), along with non-party Mary Beth Vitale (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to two of the four Directors who are on the Board at the time this action is commenced.

275.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

276.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

277.    Additional reasons that demand on Defendant Jimenez-Tuñon is futile follow. Defendant Jimenez-Tuñon has served as a Company director since March 1, 2017. Defendant Jimenez-Tuñon has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and

consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Jimenez-Tuñon signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Jimenez-Tuñon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

278.    Additional reasons that demand on Defendant Lippert is futile follow. Defendant Lippert has served as a Company director since November 16, 2018. Defendant Lippert has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Lippert signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Lippert breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

279.    Additional reasons that demand on Defendant van Sante is futile follow. Defendant van Sante has served as a Company director since June 1, 2014. Defendant van Sante has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant van Sante signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant van

Sante breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

280.   Additional reasons that demand on the Board is futile follow.

281.   The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.

282.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

283.   Pareteum has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Pareteum any part of the damages Pareteum suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

284.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

285.    The acts complained of herein constitute violations of fiduciary duties owed by Pareteum's officers and directors, and these acts are incapable of ratification.

286.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Pareteum. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Pareteum, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

287.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Pareteum to sue the Individual Defendants named herein, because, if

they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

288. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least two of the Directors cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

289. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

290. The claims made pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), that are alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

291. Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

292.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

293.    Under the direction and watch of the Directors, the 2018 and 2019 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the Company was unlikely to collect revenue from certain customer transactions; (2) the Company improperly recognized revenue in its financial statements from these customer transactions, in violation of GAAP; (3) as a result, the Company's revenue backlog and accounts receivable were artificially inflated; and (4) the Company would ultimately need to restate each of its financial statements issued during the fiscal year ended December 31, 2018, and for the fiscal quarters ended March 31, 2019 and June 30, 2019. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

294.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

295.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including election of directors, appointment of an independent auditor,

and with respect to the 2018 Proxy statement, approval of the Company's acquisition of Artilium, an advisory vote on executive compensation, an advisory vote on the frequency of executive compensation, approval of a proposal to adjourn the Company's meeting of shareholders if there were insufficient votes to approve the Company's acquisition of Artilium, and approval of the 2018 Incentive Plan.

296.    The false and misleading elements of the Proxy Statements led to the re-election of Defendants Turner, Jimenez-Tuñon, Lippert, Thomas, and van Sante, which allowed them to continue breaching their fiduciary duties to Pareteum.

297.    As a result of the false and misleading elements of the 2018 Proxy Statement, Company shareholders approved the Company's acquisition of Artilium, and the 2018 Incentive Plan.

298.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

299.    Plaintiff on behalf of Pareteum has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

300.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

301.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Pareteum's business and affairs.

302.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

303.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Pareteum.

304.    In breach of their fiduciary duties owed to Pareteum, the Individual Defendants willfully or recklessly made false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was unlikely to collect revenue from certain customer transactions; (2) the Company improperly recognized revenue in its financial statements from these customer transactions, in violation of GAAP; (3) as a result, the Company's revenue backlog and accounts receivable were artificially inflated; and (4) the Company would ultimately need to restate each of its financial statements issued during the fiscal year ended December 31, 2018, and for the fiscal quarters ended March 31, 2019 and June 30, 2019. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

305.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

306.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

307.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were

available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Pareteum's securities.

308.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Pareteum's securities.

309.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

310.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Pareteum has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

311.    Plaintiff on behalf of Pareteum has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Unjust Enrichment

312.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

313.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Pareteum.

314.    The Individual Defendants either benefitted financially from the improper conduct or received profits, bonuses, stock options, or similar compensation from Pareteum that was tied to the performance or artificially inflated valuation of Pareteum, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

315.    Plaintiff, as a shareholder and a representative of Pareteum, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

316.    Plaintiff on behalf of Pareteum has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

317.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

318.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Pareteum, for which they are legally responsible.

319.    As a direct and proximate result of the Individual Defendants' abuse of control, Pareteum has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Pareteum has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

320.    Plaintiff on behalf of Pareteum has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

321.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

322.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Pareteum in a manner consistent with the operations of a publicly-held corporation.

323.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Pareteum has sustained and will continue to sustain significant damages.

324.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

325.    Plaintiff on behalf of Pareteum has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

326.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

327.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

328.    Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct, thereby wasting the Company's assets.

329.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

330.    Plaintiff on behalf of Pareteum has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Pareteum, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Pareteum;

(c)    Determining and awarding to Pareteum the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Pareteum and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Pareteum and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Pareteum to nominate at least two candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Pareteum restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: January 15, 2019                    Respectfully submitted,

                                           **THE ROSEN LAW FIRM, P.A.**

                                           /s/Phillip Kim_____
                                           Phillip Kim
                                           275 Madison Avenue, 40th Floor
                                           New York, NY 10016
                                           Telephone: (212) 686-1060
                                           Facsimile: (212) 202-3827
                                           Email: pkim@rosenlegal.com

                                           *Counsel for Plaintiff*

## **VERIFICATION**

     I, Shiv Patel am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

     I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of ____1/14/2020____, 2020.

DocuSigned by:

1C6F30770C9049C...

Shiv Patel